**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **EPIC COMPANIES, LLC,** | § | **Case No. 19-34752** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Pending)** |
| | § | **(Emergency Hearing Requested)** |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING AUTOMATIC STAY, (V) SCHEDULING FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 27, 2019 AT 2:00 PM IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN AUGUST 27, 2019.**

Epic Companies, LLC ("Epic") and its subsidiaries, as debtors and debtors in possession in the above captioned cases (collectively, the "Debtors") hereby submit this motion (the "Motion") for entry of interim and final orders, substantially in the form attached hereto (the "Order"), pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Epic Companies, LLC (1473), Epic Diving & Marine Services, LLC (2501), Epic Applied Technologies, LLC (5844), EPIC Specialty Services, LLC (8547), Epic Alabama Steel, LLC (6835), Epic San Francisco Shipyard, LLC (5763) and Zuma Rock Energy Services, LLC (1022). The address of the Debtors' headquarters is: 1080 Eldridge Parkway, Suite 1300, Houston, Texas 77077.

Procedure (the "Bankruptcy Rules"), Rules 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "Complex Case Procedures") among other things, (i) authorizing the Debtors to obtain access to the DIP Facility (as defined below) and enter into that certain Senior Secured Super-Priority Priming Debtor-In-Possession Loan and Security Agreement, attached hereto as **Exhibit A** (the "DIP Loan Agreement"),[2] (ii) authorizing the Debtors to continue to use cash collateral in which any of the DIP Secured Parties (as defined below) or Pre-petition Parties have an interest, subject to certain restrictions, (iii) granting the DIP Liens and providing the DIP Superpriority Claims (each as defined below) on account of the obligations incurred by the Debtors under the DIP Facility, (iv) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Order, and (v) granting related relief. In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kelton C. Tonn in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") and the *Declaration of Jeffrey T. Varsalone in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, (V) Scheduling Final Hearing, and (VI) Granting Related Relief* (the "Varsalone Declaration"), each filed with the Court concurrently with this Motion.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Loan Agreement or the Order, as applicable.

## PRELIMINARY STATEMENT

1. The Debtors seek to continue operations in order to maximize the value of their estates through a sale of substantially all of their assets. By this Motion, and to continue operations through the sale, the Debtors are seeking approval of a first priority priming senior secured delayed-draw term loan debtor in possession credit facility consisting of up to $9.5 million in commitments provided by White Oak Global Advisors, LLC, as administrative agent and the lenders thereunder. The Debtors submit that the DIP Facility, as further defined below, is an exercise of the Debtors' business judgment because it will allow the Debtors to operate as a going concern through the sale of substantially all of their assets.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b).

3. Venue of these cases and this Motion in this District is proper under 28 U.S.C. § 1408.

4. The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and Local Rule 4002-1.

## CONCISE STATEMENT OF THE MATERIAL TERMS OF THE ORDER PURSUANT TO BANKRUPTCY RULE 4001 AND THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS PROCEDURES FOR COMPLEX CHAPTER 11 CASES

| DIP Facility Term | Relief Requested |
|---|---|
| **DIP Facility** | Authorizing the Borrowers to obtain postpetition financing ("DIP Financing") pursuant to a senior secured, superpriority, priming debtor-in-possession credit facility (the "DIP Facility", and the loans incurred thereunder, the "DIP Loans") in an aggregate principal amount of $9,500,000.00 solely on the terms and conditions set forth in the DIP Loan Agreement. |



8326938v2

| DIP Facility Term | Relief Requested |
|---|---|
| **DIP Documents** | Authorizing the Debtors to enter into the DIP Agreement, attached hereto as **Exhibit A**, and certain ancillary documentation (collectively with the DIP Loan Agreement, the "DIP Documents"). |
| **Adequate Protection** | Finding that the adequate protection provided to the Prepetition Secured Parties for any diminution in the value of their respective interests in the value of the Collateral in the Final Order is reasonable and sufficient to protect the interests of the Pre-petition Parties and any other parties holding interests that are secured by the Collateral. |
| **Cash Collateral** | Authorizing the Debtors to continue to use Cash Collateral subject to the restrictions set forth in the DIP Documents, the Interim Order and the Final Order. |
| **Superpriority Claims and DIP Liens** | Granting to the DIP Agent (i) superpriority administrative claims (the "DIP Superpriority Claims"); (ii) perfected senior priming liens on all assets securing the Prepetition Credit Agreement Indebtedness; (iii) perfected senior liens on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date; and (iv) perfected junior security interests on other assets of the Debtors subject to permitted liens (excluding the Prepetition Credit Agreement Liens) on the Petition Date (the assets referenced in clauses (ii)-(iv) collectively, the "**DIP Collateral**"). |
| **Use of DIP Facility Proceeds** | Authorizing the Debtors to use proceeds of the DIP Facility as set forth in the DIP Documents, solely in accordance with the Order and the Budget. |
| **Automatic Stay** | Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Agent and the DIP Lenders to (i) declare all DIP Obligations to be due and payable, (ii) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (iii) terminate the applicable DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations. |
| **506(c) Waiver** | Subject to and effective only upon entry of the Final Order, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code. |

5. The following chart contains a summary of the material terms of the Order, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the United States Bankruptcy

Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures").[3]

| | Summary of Material Terms | Location |
|---|---|---|
| **Parties to the DIP Loan Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Borrowers:** Epic Companies, LLC, Epic Diving & Marine Services, LLC, and Epic Applied Technologies, LLC.<br><br>**Guarantors:** Epic Specialty Services, LLC, Epic San Francisco Shipyard, LLC, King Aire, Inc., Zuma Rock Energy Services, LLC, Epic Alabama Steel, LLC.<br><br>**Administrative Agent:** White Oak Global Advisors, LLC<br><br>**DIP Lenders:** The lenders party to the DIP Loan Agreement. | DIP Agreement, Preamble and Recitals<br><br>Order, ¶¶ i and ii. |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Facility will mature on the earliest of:<br><br>(i) the date of the consummation of the 363 Sale; and<br><br>(ii) November 11, 2019. | DIP Agreement § 1.01 |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | $9.5 million, representing the aggregate principal amount of the DIP Lenders' Commitments, each of which is set forth on Schedule 2.01 to the DIP Agreement. | DIP Agreement § 2.01, Schedule 2.01 |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligation of each DIP Lender to make DIP Loans. | DIP Agreement §§ 4.01, 4.02 |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Subject to the provisions hereof (including **Section 2.02(d)**), from the Effective Date until each Delayed Draw Term Loan is paid in full, the Outstanding Amount of the Delayed Draw Term Loans shall bear interest at an annual rate of interest equal to ten percent (10.0%), payable in cash.<br><br>The Default interest rate is equal to the sum of: (a) the interest rate then applicable to the Term Loans; plus (b) 300.00 basis points *per annum*. | DIP Agreement §§ 1.01, 2.02 |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The Prepetition Secured Parties, including the Prepetition Senior Secured Parties and the Prepetition Junior Secured Parties. | Order, ¶¶ D(iii), (vi) |

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the Order. To the extent anything in this Motion is inconsistent with the Order, the terms of the Order shall control.

| | Summary of Material Terms | Location |
|---|---|---|
| **Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The DIP Loans shall be available on or after the Closing Date and shall be used by the Borrower, in each case in accordance with the Budget (as defined herein) to (a) fund general corporate needs, including, without limitation, working capital needs, (b) pay administrative expenses of the Cases, including reasonable fees and expenses of professionals, and (c) pay any prepetition obligations authorized to be paid pursuant to any "First Day Order" entered by the Court. | Order, ¶ 5 |
| **Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The use of cash and proceeds from the DIP Facility is subject to the Budget, attached as **Exhibit 2** to the Order. | Order, ¶ 13 |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | On August 27 each year, if any Obligations (other than Unasserted Obligations) remain outstanding, Borrowers shall pay to Administrative Agent: (A) an annual loan administration fee equal to Twenty Two Thousand Dollars ($22,000), and (B) an annual loan valuation fee equal to Twenty Five Thousand Dollars ($25,000); and each installment of each such fee shall be fully earned when due. | DIP Agreement § 2.04 |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Adequate Protection Liens.<br><br>As adequate protection of the interests of the Prepetition Senior Agent and the Prepetition Senior Lenders in the Prepetition Senior Credit Agreement Collateral for their Diminution Claims, the Prepetition Senior Agent, for itself and for the benefit of the Prepetition Senior Lenders, is hereby granted valid and perfected security interests in and liens on the DIP Collateral (the "**Senior Adequate Protection Liens**"), subordinate only to (1) the DIP Facility, (2) the Carve Out and (3) all perfected non-avoidable senior pre-existing liens as of the Petition Date.<br><br>As adequate protection of the interests of the Prepetition Junior Agent in the Prepetition Junior Credit Agreement Collateral for its Diminution Claims, the Prepetition Junior Agent is hereby granted valid, binding, continuing, enforceable and fully perfected security interests in and liens on the DIP Collateral (the "**Junior Adequate Protection Liens**"), subordinate only to (1) the DIP Facility, (2) the Carve Out, (3) all perfected non-avoidable senior pre-existing liens as of the Petition Date, (4) Senior Adequate Protection Liens and (5) the Prepetition Senior Credit Facility.<br><br>Section 507(b) Claim. As adequate protection for, and to secure payment of an amount equal to, the Diminution Claims the Prepetition Senior Secured Parties are hereby granted as and to the extent provided by Bankruptcy Code Section 507(b) allowed superpriority administrative expense claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof (excluding avoidance claims under chapter 5 of the Bankruptcy Code), but | Order, ¶ 18 |

| | Summary of Material Terms | Location |
|---|---|---|
| | subject to the payment of the Carve Out, the DIP Superpriority Claims and the DIP Obligations.<br><br>Interest, Fees, and Expenses. Without further application to this Court, the Debtors are authorized to pay forthwith in cash (i) all accrued and unpaid interest through the Petition Date owed under the Prepetition Senior Credit Agreement (including, without limitation, payment of all outstanding default interest); (ii) cash payments in an amount equal to the regularly scheduled interest at the default interest rate payable under the Prepetition Senior Credit Agreement, on the date and in the manner provided in the Prepetition Senior Credit Agreement; and (iii) all accrued and unpaid fees and disbursements owed to the Prepetition Senior Agent, including all reasonable and documented out-of-pocket fees and expenses of counsel and other professionals of the Prepetition Senior Agent, as provided under the Prepetition Senior Credit Agreement, as applicable and, in each case, whether incurred before or after the Petition Date.<br><br>Payment of Prepetition Senior Secured Parties' Professional Fees and Expenses. The Debtors shall pay the Prepetition Senior Secured Parties' professional fees and expenses within ten (10) business' days (if no written objection is received within such then (10) business day period) after such professional has delivered an invoice substantially in the form provided to the Debtors to date describing such fees and expenses; *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential or proprietary information, with a copy of such invoice to the DIP Agent, the U.S. Trustee, and the Committee (if appointed). Written objections to payment of such fees and expenses, which may only be asserted by the Debtors, the DIP Agent, the U.S. Trustee and the Committee (if appointed), must contain a specific basis for the objection and quantification of the undisputed amount of the fees and expenses invoiced; failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. None of the fees and expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided*, *however*, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.<br><br>Adequate Protection Payments. Prior to the Petition Date, the Prepetition Senior Agent received proceeds in the amount of $649,634.38 (the "**Designated Cash Collateral**") from the exercise of secured creditor remedies with respect to Epic's deposit accounts in accordance with the terms of the control agreements which were executed with respect to such deposit accounts, and which had not been applied by the Prepetition Senior Agent to satisfy the Prepetition Senior Credit Agreement Indebtedness as of the Petition Date. As additional adequate protection, the Prepetition Senior Agent shall be authorized and entitled to use and/or apply the Designated Cash Collateral to satisfy (i) prepetition accrued and unpaid fees and disbursements of the Prepetition Senior Secured Parties, including professional fees and expenses incurred by the Prepetition Senior Secured | |

| | Summary of Material Terms | Location |
|---|---|---|
| | Parties, and/or (ii) other Prepetition Senior Credit Agreement Indebtedness. | |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Debtors shall deliver:<br><br>Monthly (or more frequently if so requested by Administrative Agent):<br><br>(i) not later than thirty (30) days after each Fiscal Month: (A) accounts receivable listings and agings and Inventory reports for the preceding Fiscal Month; and (B) accounts payable listings and agings as at the preceding Fiscal month end;<br><br>(ii) information regarding idle and repair times for any Vessel;<br><br>(iii) a detailed asset report setting forth the information listed in Exhibit E together with other information requested by Agent and Lenders from time to time.<br><br>Upon request by Administrative Agent:<br><br>(iv) a revised Budget of Loan Parties; and<br><br>(v) such other reports as to the Collateral, or the financial condition of Loan Parties, as Administrative Agent may reasonably request. | DIP Agreement § 6.01(e) |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Agreement will require compliance with the Milestones, which include:<br><br>i. on the Petition Date, the Loan Parties shall file a motion seeking approval of the Agreement and the Delayed Draw Term Loans;<br><br>ii. on or before the date that is three (3) days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court;<br><br>iii. on or before the 20th day after the Petition Date, the Conversion Date shall have occurred;<br><br>iv. to the extent that (A) Epic is not a Party to this Agreement, or (B) Epic has not been authorized by the Orders to incur secured indebtedness or to make payments in respect of the fees and other amounts as contemplated by and in accordance with the Agreement, then on or before the date that is two Business Days after the Conversion Date (X) Epic shall have executed and delivered the Epic Joinder to Administrative Agent, and (Y) to the extent not already provided for in the applicable Order then in effect, the Bankruptcy Court shall have entered a Court Order, on terms consistent with the Orders and otherwise in form and substance satisfactory to Administrative Agent authorizing Epic to execute the Epic Joinder and providing that the Orders are applicable with respect to Epic, in each case nunc pro tunc to the Petition Date; | DIP Agreement § 8.01(s) |

| | Summary of Material Terms | Location |
|---|---|---|
| | v. on or before the date that is thirty-five (35) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court and shall apply to all of the Loan Parties (including Epic);<br><br>vi. on or before the date that is three (3) days after the Petition Date, the Loan Parties shall have filed a motion with the Bankruptcy Court seeking approval of a 363 Sale (including approval of the right of the Lenders and the Pre-Petition Parties to "credit bid" for or otherwise purchase the Loan Parties), approval of such sale to the Stalking Horse Bidder (subject to higher and better offers), if any, and bid protections, sale procedures and auction procedures in connection therewith, in form and substance satisfactory to the Administrative Agent and Required Lenders (the "Sale Motion");<br><br>vii. on or before the Petition Date, the Loan Parties shall have begun to solicit bids from potential bidders in the 363 Sale including resoliciting bids from potential buyers contacted by the Loan Parties prior to the Petition Date;<br><br>viii. on or before the date that is thirty-five (35) days after the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent and Required Lenders, approving bid protections, sale procedures and auction procedures in connection with the 363 Sale and of the bid of the Stalking Horse Bidder;<br><br>ix. on or before the date that is sixty-five (65) days after the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent, granting the Sale Motion in form and substance satisfactory to the Administrative Agent and Required Lenders; and<br><br>x. on or before the date that is seventy-five (75) days after the Petition Date, the Loan Parties shall have consummated the 363 Sale | |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | <u>DIP Superpriority Claims</u>. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Provisions (as defined herein)), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 or any other provision of the Bankruptcy Code (the "<u>DIP Superpriority Claims</u>"), which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject only to the Carve Out.<br><br><u>DIP Liens</u>. As security for the DIP Obligations, effective and perfected automatically upon the date of the Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the | Order, ¶¶ 7, 9 |

| | Summary of Material Terms | Location |
|---|---|---|
| | DIP Agent of any DIP Collateral (as defined herein), the following security interests and liens (all such liens and security interests granted to the DIP Agent, for its respective benefit and for the benefit of the DIP Lenders, pursuant to the Interim Order and the DIP Documents, (the "**DIP Liens**") are hereby granted to the DIP Agent, for their respective benefit and the benefit of the DIP Lenders:<br><br>(a) pursuant to section 364(d) of the Bankruptcy Code, perfected senior priming liens on all assets securing the Prepetition Credit Agreement Indebtedness, regardless of whether any lien or any security interest securing or purporting to secure the Prepetition Credit Agreement Indebtedness is valid or invalid, perfected or unperfected, or avoidable or non-avoidable, subject to all perfected non-avoidable senior pre-existing liens as of the Petition Date including with respect to the Hedron, a Vessel flagged under the laws of Vanuatu, any maritime lien for "necessaries" within the meaning of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31301 *et seq.* that have attached to such Vessel and which have not been bonded in accordance with applicable law;<br><br>(b) pursuant to section 364(c)(2) of the Bankruptcy Code, perfected senior liens on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by section 546 of the Bankruptcy Code);[4] and<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests on other assets of the Debtors subject to permitted liens (excluding the Prepetition Credit Agreement Liens) on the Petition Date (the assets referenced in clauses (a)-(c) collectively, the "DIP Collateral").<br><br>The DIP Collateral includes all tangible and intangible prepetition and postpetition property and interests in property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, including, without limitation: (i) all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, intellectual property, instruments, insurance, inventory, investment property, letter-of-credit rights, money and any supporting obligations related thereto; (ii) all commercial tort claims; (iii) all books and records pertaining to the DIP Collateral; (iv) all property of any Prepetition Credit Party held by the DIP Agent, the DIP Lenders or any Prepetition Secured Party, including all property of every description, in the custody of or in transit to the DIP Agent, the DIP Lenders or any Prepetition Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such party or as to which such party may have any right or power, including, but not limited to cash; (v) all other goods (including, but not limited to, fixtures) and personal property, whether tangible or intangible and wherever located; (vi) all owned real property interests, and to the extent subject to a prepetition mortgage in favor of the Prepetition Agent, leased real property (including, for the avoidance of doubt, any ground leases) and all proceeds of all other leased property; (vii) actions brought under section | |

[4] Pursuant to paragraph 9(b), the Interim Order grants liens on the Debtors' unencumbered assets, which includes certain real property in Houma, Louisiana located at 168, 306, and 403 Menard Road and 600 Thompson Road.



8326938v2

| | Summary of Material Terms | Location |
|---|---|---|
| | 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; and (ix) all proceeds of the foregoing, plus all Prepetition Credit Agreement Collateral. | |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Order provides the liens and DIP Superpriority Claims provided under the DIP Facility shall be subject to a carve-out consisting of the sum of<br><br>(i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below),<br><br>(ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below),<br><br>(iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327 or 328 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee (if appointed), pursuant to sections 328 or 1103 of the Bankruptcy Code and, with respect to Committee professionals (the "**Committee Professionals**") and the Debtor Professionals (together with the Committee Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, and<br><br>(iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").<br><br>For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by e-mail (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and acceleration of the DIP Obligations under the DIP Facility stating that the Post-Carve Out Trigger Notice Cap has been invoked. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Credit Agreement Indebtedness. | Order, ¶ 8 |
| **Events of Default** | The DIP Agreement contains events of default that are usual and customary for debtor in possession financings, including without limitation, a breach of any milestone. | DIP Agreement § 8.01 |

| | Summary of Material Terms | Location |
|---|---|---|
| Bankruptcy Rule 4001(c)(l)(B) | | |
| **Waiver/Modification of the Automatic Stay** | Upon the occurrence and during the continuation of an Event of Default, any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Agent and the DIP Lenders to (i) declare all DIP Obligations to be due and payable, (ii) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (iii) terminate the applicable DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations.<br><br>In addition to the rights and remedies described above, upon not less than five (5) business days' prior written notice to the Debtors (with a copy to counsel to each of the Prepetition Agent, the Committee, if any, and the U.S. Trustee) and a notice filed on the Court's docket within two (2) hours of its delivery to the Debtors, following the occurrence and continuance of an Event of Default, the DIP Agent is hereby granted relief from the automatic stay provisions of section 362 of the Bankruptcy Code without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on, their DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the applicable DIP Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral. Solely during the foregoing five (5) business day period the Debtors may seek, and the DIP Agent shall consent, to an emergency hearing on the notice of an Event of Default; provided, however, that the issues that may be raised by the Debtors in opposition to the exercise of rights and remedies are (i) whether an Event of Default has in fact occurred and is continuing, (ii) contesting whether the Debtors may use Cash Collateral on an emergency basis, or (iii) arguing for the continued imposition of the automatic stay to the extent that it would be lifted pursuant to paragraph 12(b) of the Interim Order, and other than as set forth in the prior clause of this proviso, the Debtors hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Documents or the Interim Order; provided, further that during such five (5) business day period, the Debtors may not use Cash Collateral except to pay regular payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Budget.<br><br>The DIP Agent, the DIP Lenders, and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. | Order, ¶¶ 12, 22 |

| | Summary of Material Terms | Location |
|---|---|---|
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Agent, the DIP Lenders, and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent, the DIP Lenders, or the Prepetition Agent choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, but subject in all respects to the provisions of the Interim Order. | Order, ¶ 22 |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Loan Parties shall indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Loan Parties arising out of, in connection with, or as a result of: (i) the execution or delivery of the Agreement, any other Loan Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (ii) any Term Loan or the use or proposed use of the proceeds thereof; (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Loan Parties or any Subsidiary thereof or any Environmental Claim or Environmental Liability related in any way to Loan Parties or any Subsidiary thereof; or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Loan Parties or any Subsidiary thereof, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted result from the gross negligence or willful misconduct of such Indemnitee. | DIP Agreement § 10.04(b) |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

6. The Order contains the following provisions (the "Significant Provisions") identified in the Complex Case Procedures.[5]

[5] Pursuant to the Complex Case Procedures, ¶ 21, effective June 21, 2019, Debtor(s)'s counsel should highlight provisions of proposed orders issued under 11 U.S.C. §§ 363 or 364 that contain the following: a. Sale or plan

a. **Sale or Plan Confirmation Milestones**. Section 8.01(s) of the DIP Agreement provides that:

(i) on the Petition Date, the Loan Parties shall file a motion seeking approval of the Agreement and the Delayed Draw Term Loans;

(ii) on or before the date that is three (3) days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court;

(iii) on or before the 20th day after the Petition Date, the Conversion Date shall have occurred;

(iv) to the extent that (A) Epic is not a Party to the Agreement, or (B) Epic has not been authorized by the Orders to incur secured indebtedness or to make payments in respect of the fees and other amounts as contemplated by and in accordance with this Agreement, then on or before the date that is two Business Days after the Conversion Date (X) Epic shall have executed and delivered the Epic Joinder to Administrative Agent, and (Y) to the extent not already provided for in the applicable Order then in effect, the Bankruptcy Court shall have entered a Court Order, on terms consistent with the Orders and otherwise in form and substance satisfactory to Administrative Agent authorizing Epic to execute the Epic Joinder and providing that the Orders are applicable with respect to Epic, in each case *nunc pro tunc* to the Petition Date;

(v) on or before the date that is thirty-five (35) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court and shall apply to all of the Loan Parties (including Epic);

(vi) on or before the date that is three (3) days after the Petition Date, the Loan Parties shall have filed a motion with the Bankruptcy Court seeking approval of a 363 Sale (including approval of the right of the Lenders and the Pre-Petition Parties to "credit bid" for or otherwise purchase the Loan Parties), approval of such sale to the Stalking Horse Bidder (subject to higher and better offers), if any, and bid protections, sale procedures and auction procedures in connection therewith, in form and substance satisfactory to the Administrative Agent and Required Lenders (the "*Sale Motion*");

(vii) on or before the Petition Date, the Loan Parties shall have begun to solicit bids from potential bidders in the 363 Sale including resoliciting bids

confirmation milestones; b. Cross-collateralization; c. Roll ups; d. Liens on avoidance actions or proceeds of avoidance actions; e. Default provisions and remedies; f. Releases of claim against lender or others; g. Limitations on fees for advisors to official committees; h. Priming liens; i. Any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

from potential buyers contacted by the Loan Parties prior to the Petition Date;

(viii) on or before the date that is thirty-five (35) days after the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent and Required Lenders, approving bid protections, sale procedures and auction procedures in connection with the 363 Sale and of the bid of the Stalking Horse Bidder;

(ix) on or before the date that is sixty-five (65) days after the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court, in form and substance satisfactory to the Administrative Agent, granting the Sale Motion in form and substance satisfactory to the Administrative Agent and Required Lenders; and

(x) on or before the date that is seventy-five (75) days after the Petition Date, the Loan Parties shall have consummated the 363 Sale.

b. **Cross-Collateralization**. None.

c. **Roll Ups**. None.

d. **Liens on Avoidance Actions or Proceeds of Avoidance Actions**. Upon entry of the Final DIP Order, the DIP Facility shall be secured by liens on the proceeds of Avoidance Actions.

e. **Default Provisions and Remedies**. The DIP Agreement contains customary Events of Default provisions, including case milestones, and will allow for remedies by the Administrative Agent upon direction by the Required Lenders. *See* DIP Agreement §§ 8.01-02.

f. **Releases of Claim Against Lender or Others**. The Order provides for the unconditional release and discharge by the Debtors of each of the Prepetition Secured Parties from any and all obligations and liabilities related to any of the Prepetition Credit Documents and the transactions contemplated under such documents.

g. **Limitations on Fees for Advisors to Official Committees**. The Order provides that the Committee may expend up to $50,000 for the fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, the stipulations and admissions contained in paragraph D. *See* Order ¶ 30.

h. **Priming Liens**. The Order provides the DIP Agent for its own benefit and the benefit of the DIP Lenders pursuant to section 364(d) of the Bankruptcy Code perfected senior priming liens on all assets securing the Prepetition Credit Agreement Indebtedness, regardless of whether any lien or any

> security interest securing or purporting to secure the Prepetition Credit Agreement Indebtedness is valid or invalid, perfected or unperfected, or avoidable or non-avoidable, subject to all perfected non-avoidable senior pre-existing liens as of the Petition Date including with respect to the Hedron, a Vessel flagged under the laws of Vanuatu, any maritime lien for "necessaries" within the meaning of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31301 *et seq.* that have attached to such Vessel and which have not been bonded in accordance with applicable law.

7. The explanation for the inclusion of the foregoing Significant Provisions, as required by Complex Case Procedures ¶¶ 21(a)–(i), which is made applicable by Bankruptcy Local Rule 1075-1, is that is that such Significant Provisions were necessary to obtain the DIP Lenders' agreement to provide the DIP Facility on the terms and conditions reflected in the DIP Agreement. As set forth herein, the DIP Facility is critical to ensure that the Debtors have sufficient liquidity to conduct a competitive sale process that will maximize value of the Debtors' estates for all parties in interest.

8. In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Order should be approved.

## BACKGROUND

### A. General Background

9. On August 26, 2019 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

10. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

12. The Debtors are a full-service provider to the global decommissioning, installation and maintenance markets headquartered in Houston, Texas. The Debtors' services include heavy lift, diving and marine, and well services.

13. The Debtors filed these Chapter 11 Cases to market and sell the Debtors' business as a going concern. For weeks prior to the Petition Date, the Debtors and their fiduciaries worked to secure postpetition financing to provide sufficient liquidity to support the Debtors' business, pay their remaining employees and to protect their critical stakeholders during the marketing and sale of the Debtors' assets.

14. Additional information regarding the Debtors and the Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of the Chapter 11 Cases, is set forth in the First Day Declaration, filed contemporaneously with this Motion.

**B. Summary of the Debtors' Pre-Petition Capital Structure**

15. Epic Companies, Epic Diving & Marine Services, LLC, Epic Applied, Epic Specialty Services, LLC, Epic San Francisco Shipyard, LLC, King Aire, Inc., Zuma Rock Energy Services, LLC, Epic Alabama Steel, LLC, TSB Holding Company, LLC, TSB Offshore Inc., ERP Environmental Fund, Inc., Ana M. Clarke, Thomas M. Clarke and David A. Wiley (the "Prepetition Senior Credit Parties"), White Oak, as administrative agent (in such capacity, the "Prepetition Senior Agent"), and the lenders from time to time party thereto (the "Prepetition Senior Lenders" and, together with the Prepetition Senior Agent, the "Prepetition Senior Secured Parties"), are party to that certain Credit Agreement, dated as of July 22, 2019 (as the same has

been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Senior Credit Agreement") and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "Prepetition Senior Credit Documents").

16. As of the Petition Date, the outstanding aggregate principal amount under the Prepetition Senior Credit Agreement was not less than $50,295,463.69 (together with all other outstanding Obligations, as defined in the Prepetition Senior Credit Agreement, including interest, fees and expenses, the "Prepetition Senior Credit Agreement Indebtedness").

17. To secure the Prepetition Senior Credit Agreement Indebtedness, the Prepetition Senior Credit Parties granted to the Prepetition Senior Agent, for the benefit of such agent and the Prepetition Senior Lenders, valid, binding, perfected, first priority security interests in and continuing liens (the "Prepetition Senior Credit Agreement Liens") on substantially all of their assets and property including the Collateral (as defined in the Prepetition Senior Credit Agreement), which includes, without limitation, the Vessels (as defined in the Prepetition Senior Credit Agreement) (and any asset related thereto or located thereon), certain pledges of equity interests pursuant to the Sanare Pledge Agreement (as defined in the Prepetition Senior Credit Agreement), Real Property Collateral (as defined in the Prepetition Senior Credit Agreement), all other collateral as described or defined in any other Collateral Document (as defined in the Prepetition Senior Credit Agreement) and Cash Collateral (as defined herein) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Senior Credit Agreement Collateral").

18. Epic Companies, Epic Diving & Marine Services, LLC, Epic Applied, Epic Specialty Services, LLC, Epic San Francisco Shipyard, LLC, King Aire, Inc., Zuma Rock Energy Services, LLC, Epic Alabama Steel, LLC, TSB Holding Company, LLC, TSB Offshore Inc., ERP Environmental Fund, Inc., Ana M. Clarke, Thomas M. Clarke, David A. Wiley, and Thomas M. Clarke and Ana M. Clarke 100% JTWROS (collectively, the "Prepetition Junior Credit Parties" together with the Prepetition Senior Credit Parties, the "Prepetition Credit Parties"), Acqua Liana Capital Partners, LLC, as administrative agent (in such capacity, the "Prepetition Junior Agent" together with the Prepetition Senior Agent, the "Prepetition Agents"), and the lenders from time to time party thereto (the "Prepetition Junior Lenders" together with the Prepetition Subordinated Agent, the "Prepetition Junior Secured Parties" and together with the Prepetition Senior Secured Parties, the "Prepetition Secured Parties"), are party to that certain Third Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (as the same has been and may be amended, restated, amended and restated, refinanced, replaced, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Junior Credit Agreement" together with the Prepetition Senior Credit Agreement, the "Prepetition Credit Agreements") and, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "Prepetition Junior Credit Documents" together with the Prepetition Senior Documents, the "Prepetition Credit Documents").

19. As of the Petition Date, the outstanding aggregate principal amount under the Prepetition Junior Credit Agreement was not less than $65,340,299.28 (together with all other outstanding Obligations, as defined in the Prepetition Junior Credit Agreement, including interest,

fees and expenses, the "Prepetition Junior Credit Agreement Indebtedness" together with the Prepetition Senior Credit Agreement Indebtedness, the "Prepetition Credit Agreement Indebtedness").

20. To secure the Prepetition Junior Credit Agreement Indebtedness, the Prepetition Junior Credit Parties granted to the Prepetition Junior Agent, for the benefit of such agent and the Prepetition Junior Lenders, valid, binding, perfected, second priority security interests in and continuing liens (the "Prepetition Junior Credit Agreement Liens" together with the Prepetition Senior Credit Agreement Liens, the "Prepetition Credit Agreement Liens") on the Prepetition Senior Credit Agreement Collateral, subject in all respects to the first priority liens of the Prepetition Senior Agent on such collateral (the "Prepetition Junior Credit Agreement Collateral" together with the Prepetition Senior Credit Agreement Collateral, the "Prepetition Credit Agreement Collateral").

21. The Prepetition Senior Agent and the Prepetition Junior Agent entered into that certain Intercreditor and Subordination Agreement dated as of July 22, 2019 (the "Prepetition Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Prepetition Credit Parties. Each of the Prepetition Credit Parties under the Prepetition Credit Documents acknowledged and agreed to the Prepetition Intercreditor Agreement.

**C. Entry into the DIP Facility**

22. Epic, Epic Diving & Marine Services, LLC, and Epic Applied Technologies, LLC, in their capacities as Borrowers, and Epic Specialty Services, LLC, Epic San Francisco Shipyard, LLC, King Aire, Inc., Zuma Rock Energy Services, LLC, Epic Alabama Steel, LLC, TSB Holding Company, LLC, TSB Offshore Inc., and ERP Environmental Fund, Inc., in their capacities as guarantors under the DIP Facility, have negotiated the DIP Agreement with White Oak Global

Advisors, LLC, as administrative agent (in such capacity, the DIP Agent), and the DIP Lenders, as lenders, to obtain the DIP Loans through that DIP Facility that shall consist of a first priority priming senior secured delayed-draw term loan debtor in possession credit facility consisting of up to $9.5 million.

23. After extensive arms' length, and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of their Prepetition Credit Agreement Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection. Among other things, the adequate protection contemplated by the DIP Financing is designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the Debtors' use of the Prepetition Credit Agreement Collateral, including Cash Collateral, during the pendency of these Chapter 11 Cases.

**THE DEBTORS' NEED FOR DIP FINANCING**

24. The Debtors seek relief under the DIP Motion to utilize their cash and to obtain additional financing to prosecute the Chapter 11 Cases and run a sales process. As detailed in the Varsalone Declaration, the Debtors need the immediate use of cash collateral and additional financing to fund operations for the sales process. Otherwise, the Debtors will experience irreparable harm because they cannot their pay employees or professionals without the use of cash collateral and additional financing. Through the use of cash collateral and the additional financing, the Debtors will have access to the necessary funding to pay (1) employees and contractors; (2) rent; (3) insurance; (4) miscellaneous operating expenses including utilities and supplies; and (5) bankruptcy professionals and asset sale related costs.

25. Beginning on or about August 20, 2019, either Mr. Varsalone or other G2 professionals, working under his direction, screened G2's proprietary database of potential DIP lenders who might have an interest in providing DIP financing, focusing on DIP size, industry and

potential to provide the DIP financing in a second lien position. Ultimately, either Mr. Varsalone or others at G2 working under my direction, contacted twelve potential lenders. None of the lenders contacted expressed any interest in exploring a potential financing. Based on the initial feedback from the potential lenders contacted, it is Mr. Varsalone's opinion that expanding the scope and time of the DIP marketing process would not yield any material interest in providing DIP financing without a priming lien to White Oak or on better terms.

26. Because White Oak is currently undersecured, it would be difficult for the Debtors to demonstrate that White Oak would be adequately protected. Thus, to avoid an expensive, time consuming fight with the Debtors' prepetition lender at the beginning of the Debtors' Chapter 11 Cases, the Debtors exercised their reasonable business judgment in selecting the financing proposed by White Oak.

27. The provisions of the Interim Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain under the circumstances. Approval of the motion will ensure the Debtors are able to maintain their operations, pursue and achieve a successful restructuring transaction, and maximize the value of their estates for the benefit of their stakeholders.

## BASIS FOR RELIEF

### A. The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.

#### *i. Entering into the DIP Agreement is an Exercise of the Debtors' Sound Business Judgment.*

28. The Court should authorize the Debtors, in exercising their sound business judgment, to enter into the DIP Documents, obtain postpetition DIP financing under the DIP Facility, and continue using Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such

credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

29. To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

30. The Debtors' entry into the DIP Facility represents a sound exercise of their business judgment. The Debtors are requesting authorization to enter into the DIP Agreement for the purpose of ensuring sufficient liquidity for a competitive sale process in order to maximize value for creditors. A result of good-faith, arm's-length negotiations, the DIP Facility is critical for the Debtors to execute and complete their restructuring efforts successfully. No alternative sources of financing with terms as favorable as those contained in the DIP Facility are currently available to the Debtor.

31. Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.

**B. The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

32. The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code. Significantly, the Debtors propose to provide, subject only to the Carve Out: (a) the DIP Superpriority Claims; (b) perfected senior priming liens on all assets securing the Prepetition Credit Agreement Indebtedness, subject to all perfected non-avoidable senior pre-existing liens as of the Petition Date including with respect to the Hedron, a Vessel flagged under the laws of Vanuatu, any maritime lien for "necessaries" within the meaning of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31301 *et seq.* that have attached to such Vessel and which have not been bonded in accordance with applicable law; (c) perfected senior liens on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by section 546 of the Bankruptcy Code) including, and effective upon entry of a Final Order, the Avoidance Proceeds; and pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests on other assets of the Debtors subject to permitted liens (excluding the Prepetition Credit Agreement Liens) on the Petition Date.

33. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on

> property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

34. Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

b. the credit transaction is necessary to preserve the assets of the estate; and

c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

35. No party contacted by the Debtors' advisors during the DIP Facility marketing process was interested in providing, or willing to provide, a holistic package of postpetition financing to the Debtors on an unsecured basis. The only option to achieve the terms of the DIP Facility was for the Debtors to enter into an arrangement with the DIP Lenders whereby the DIP Facility would be secured by first priority priming liens; no other party offered sufficient postpetition financing on more favorable terms to meet the Debtors' liquidity and capital needs to maintain operations through a sale of the Debtors' assets.

36. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest

of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). As such, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected. Here, the Prepetition Secured Parties have consented to the priming liens securing the DIP Facility. Further, the Debtors will continue to provide adequate protection set forth in the Order, whereby Debtors provide the Prepetition Secured Parties with safeguards to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay in the form of superpriority claims under section 507(b) of the Bankruptcy Code, replacement adequate protection liens, and Adequate Protection Payments, pursuant to the adequate provisions further detailed above in the Summary of Material Terms. The Pre-petition Parties will also receive payment of fees and expenses, current reporting under the applicable Prepetition Debt Documents, and adherence to certain case milestones. Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**C. No Comparable Alternative to the DIP Facility Is Reasonably Available**

37. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986)

(demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

38. Here, the Debtors have made a good faith effort to seek out optimal postpetition financing arrangements to meet their restructuring objectives. While the Debtors entered into these chapter 11 proceedings with the financial support of the Prepetition Secured Parties, the DIP Facility represent a superior solution to the Debtors' financing needs because they represent a consensual path forward in these chapter 11 cases that provides sufficient liquidity for the Debtors to maintain operations during a sale process for the sale of substantially all of the Debtors' assets, thereby maximizing value for the Debtors' creditors. Accordingly, the DIP Facility represents the best option available to address the Debtors' immediate liquidity needs, and the Debtors respectfully submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances.

**D. The Use of Cash Collateral is Warranted and Should Be Approved.**

39. Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case by case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon*

*Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")); *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)). Courts generally have found that using cash collateral to preserve the value of the secured creditors' collateral is a form of adequate protection in itself. *See, e.g., In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

40. Through this Motion, the Debtors seek the continued use of the Cash Collateral on the terms set forth in the Final Order (which are incorporated into the proposed Order by reference), subject to certain limitations. The Final Order was carefully calibrated and highly negotiated, and provided for the use of the Prepetition Credit Agreement Collateral in exchange for a comprehensive adequate protection package. That package provides safeguards to protect against the post-petition diminution in value of the collateral resulting from the use, sale, or lease of the collateral by the Debtors and the imposition of the automatic stay. Significantly, the adequate

protection package resolved the use of Cash Collateral on a consensual basis avoiding foreseeable litigation that would have been value destructive and unhelpful for moving the Debtors' cases forward.

41. The Debtors propose to provide an adequate protection package equivalent to that set forth in the Order. The Prepetition Secured Parties would not have consented to the Debtors' use of collateral, including Cash Collateral, without the adequate protection provided in the Order. Obtaining the use of collateral consensually saved the Debtors' estates amounts far in excess of what it could cost to litigate non-consensual use.

42. The Debtors believe that the proposed adequate protection in the Order and DIP Agreement is necessary and sufficient for the Debtors to continue to use Cash Collateral. Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

43. Courts in this district and others have approved similar adequate protection packages in other recent chapter 11 cases. *See, e.g.*, *In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 16, 2018) (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments, and fees and expenses on an interim basis to the applicable prepetition secured creditors); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same); *In re Energy XXI LTD.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (same); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Apr. 18, 2016) (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (same).

44. Further, the Prepetition Secured Parties will inherently benefit from the Debtors' continued use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value. *See, e.g., 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

45. The Debtors believe continuation of the consensual use of Cash Collateral set forth in the Final Order are reasonable, consistent with the Bankruptcy Code and applicable Fifth Circuit law, and in the best interest of the Debtors' estates and all stakeholders. The Debtors therefore seek authority to continue to use Cash Collateral on the terms of the Order, as incorporated by reference and modified by the terms of the Order.

**E. The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e).**

46. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

47. The DIP Facility is the result of the Debtors' reasonable judgment and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lenders. The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and therefore the DIP Agent and DIP Lenders are entitled to all of the protections afforded thereby.

**F. The Automatic Stay Should be Modified on a Limited Basis.**

48. The Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Order. The proposed Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Order. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Vanguard Natural Resources, Inc.* (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Westmoreland Coal Company*, (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order);

*In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same). The Debtors therefore submit that the modification of the automatic stay as set forth in the Order should be approved.

**WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)**

49. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**RESERVATION OF RIGHTS**

50. Nothing contained herein is intended or shall be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**NOTICE**

51. Notice of this Motion shall be given to (a) the U.S. Trustee; (b) the Debtors' 30 largest unsecured creditors on a consolidated basis; (c) counsel to White Oak Global Advisors, LLC; (d) counsel to the agent under the Debtors' second-lien credit facility; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and

(h) any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.

**CONCLUSION**

52. The Debtors respectfully request that the Court enter the Order substantially in the form attached hereto, granting the relief requested in this Motion, and granting such other and further relief the Court may deem proper.

Dated: August 26, 2019.
Houston, Texas

**PORTER HEDGES LLP**

By: */s/ John F. Higgins*
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
M. Shane Johnson (TX 24083263)
Genevieve M. Graham (TX 24085340)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**