# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EPIC COMPANIES, LLC, | § | Case No. 19-34752 |
| | § | |
| Debtors.[1] | § | (Joint Administration Pending) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION
(I) FOR ENTRY OF AN ORDER (A) APPROVING
AUCTION AND BID PROCEDURES, INCLUDING BID PROTECTIONS,
(B) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF THE
DEBTORS' ASSETS, AND (C) GRANTING RELATED RELIEF, AND (II) FOR ENTRY
OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**
>
> **RELIEF IS REQUESTED NOT LATER THAN SEPTEMBER 10, 2019.**

Epic Companies, LLC ("Epic") and certain of its subsidiaries, as debtors and debtors in possession in the above captioned cases (collectively, the "Debtors") file this Motion (the "Motion") for (i) an order (a) approving auction and bid procedures, (b) authorizing and scheduling an auction for the sale of substantially all of the Debtors' assets, and (c) granting related relief (the "Bid Procedures Order"); and (ii) an order (a) approving the sale of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Epic Companies, LLC (1473), Epic Diving & Marine Services, LLC (2501), Epic Applied Technologies, LLC (5844), EPIC Specialty Services, LLC (8547), Epic Alabama Steel, LLC (6835), Epic San Francisco Shipyard, LLC (5763), Zuma Rock Energy Services, LLC (1022), and King Aire, Inc. (9645). The address of the Debtors' headquarters is: 1080 Eldridge Parkway, Suite 1300, Houston, Texas 77077.

Debtors' assets free and clear of all liens, claims, encumbrances, and interests, (b) authorizing the assumption and assignment of executory contracts and unexpired leases, and (c) granting related relief (the "Sale Order"). In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kelton C. Tonn in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"). In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      In an effort to maximize the value of their assets for the benefit of creditors, the Debtors have negotiated an asset purchase agreement (the "Stalking Horse Agreement")[2] with White Oak Global Advisors, LLC ("White Oak" or, the "Stalking Horse Bidder") for the sale of substantially all of the Debtors' assets (the "Purchased Assets"),[3] except for certain excluded assets. As consideration for the sale, the Stalking Horse Bidder will credit bid its pre and postpetition secured debt in the amount of $48,900,000, and will assume $40,000,000 of the Prepetition Junior Credit Agreement Indebtedness (the "Assumed Debt"). The Stalking Horse Bidder's offer remains subject to higher and better bids at auction. Upon closing the sale of the Purchased Assets, the Stalking Horse Bidder will the sell certain of the Purchased Assets to Alliance Energy Services, LLC ("Alliance") for a cash purchase price of $40 million and an assumption of $35 million of the Assumed Debt, among other terms, in a separate transaction financed by White Oak, and is in discussions regarding the sale of other portions of the Purchased Assets to other third parties on terms to be agreed.

2.      To induce the Stalking Horse Bidder to serve as the "stalking horse" bidder in the sales process, the Debtors have agreed to certain bid procedures and bid protections. The Debtors

---

[2] Capitalized terms not defined herein have the meaning ascribed to them in the Stalking Horse Agreement.
[3] The Stalking Horse Agreement includes TSB Offshore, Inc. because it intends to file for bankruptcy prior to the bid procedures hearing.

seek court approval of these procedures and bid protections as set forth below. Additionally, to facilitate a smooth and orderly chapter 11 process, the Debtors are separately seeking authority to borrow up to $9.5 million from White Oak to fund the postpetition sales process.[4]

3.      The Debtors seek the immediate entry of the Bid Procedures Order, establishing the bid procedures related to an auction of the Debtors' assets, approving the forms of the Stalking Horse Agreement, the Notice of Cure Amounts, and the Notice of Auction, and the bid protections being granted to the Stalking Horse Bidder, scheduling a hearing to approve the proposed sale, and establishing notice procedures related to the assumption and assignment of executory contracts and unexpired leases. Kennedy Marr will market the vessels postpetition.

4.      In this Motion, the Debtors also seek entry of the Sale Order approving the proposed sale to the Stalking Horse Bidder on the terms set forth in the Stalking Horse Agreement or to the highest and/or best bid received at auction and authorizing the assumption and assignment of certain executory contracts and unexpired leases.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

6.      The legal predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

---

[4] *See Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, (V) Scheduling Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion," and the order approving the DIP Motion, the "DIP Order").

and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas ("Complex Chapter 11 Procedures").

## EMERGENCY CONSIDERATION

7.      Pursuant to Bankruptcy Local Rule 9013-1(i) and Bankruptcy Rule 6003, the Debtors request emergency consideration of this Motion. Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." FED. R. BANKR. P. 6003. The proposed order approving the DIP Motion includes milestones for approval of bid procedures and Stalking Horse Agreement by September 30, 2019 and entry of sale order by October 30, 2019. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 because in order to provide sufficient notice of the auction and sale hearing and to allow interested parties sufficient time to diligence the Debtors' assets, entry of the Bid Procedures Order is necessary on an emergency basis. Therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## BACKGROUND

### A.      General Background

8.      On August 26, 2019 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

9.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

11. The Debtors are a full-service provider to the global decommissioning, installation and maintenance markets headquartered in Houston, Texas. The Debtors' services include heavy lift, diving and marine, and well services.

12. The Debtors filed these Chapter 11 Cases to market and sell the Debtors' business as a going concern. For weeks prior to the Petition Date, the Debtors and their fiduciaries worked to secure postpetition financing to provide sufficient liquidity to support the Debtors' business, pay their remaining employees and to protect their critical stakeholders during the marketing and sale of the Debtors' assets.

13. Additional information regarding the Debtors and the Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of the Chapter 11 Cases, is set forth in the First Day Declaration, filed contemporaneously with this Motion.

14. At the time the Debtors entered into the Stalking Horse Agreement the Debtors did not have access to any cash because their lender was sweeping cash on a daily basis. Prior to the Petition Date, the Debtors also held discussions with White Oak, Alliance, and certain of the Debtors' insiders regarding a sale transaction that contemplated, among other things, (i) White Oak acquiring certain of its collateral via an exercise of secured creditor remedies in exchange for a significant reduction in its claims against the Debtors and a corresponding reduction in the guarantees of those claims by the Debtors' insiders, and (ii) Alliance acquiring that collateral from White Oak and also assuming certain liabilities of the Debtors (including, without

limitation, certain of the Debtors' obligations on account of White Oak's junior indebtedness). The parties were unable to agree to terms on such a transaction outside of chapter 11 because of, among other things, (i) the Debtors' deteriorating liquidity situation, (ii) the attempts by creditors to impose liens on the Debtors' assets, and (iii) the commencement of an involuntary chapter 7 case against Epic Companies, LLC in the Eastern District of Louisiana on August 2, 2019. The Stalking Horse Agreement and the ancillary agreements entered into in connection therewith embody a transaction similar to transaction these parties had discussed prior to the Petition Date, subject to higher and better offers. White Oak has also had similar discussions with other third parties regarding the sale of other portions of the Purchased Assets following the consummation of the transaction contemplated by the Stalking Horse Agreement on terms to be agreed. To that end, and as detailed in the First Day Declaration, during the weeks leading up to the Petition Date, the Debtors' prepetition lender was called on to provide bridge financing that allowed the Debtors to meet critical obligations including satisfying payroll, which maintained the value of the Debtors' assets, while negotiating the Stalking Horse Agreement and securing sufficient postpetition financing to allow for an expedited sales process. In light of this, the Debtors' time in chapter 11 is constrained, necessitating an expedited auction process.

15.     Accordingly, the Debtors have proposed the following deadlines associated with the sale of the Purchased Assets: (i) NDA Deadline on September 25, 2019 at 5:00 p.m. Central Time;[5] (ii) Bid Deadline on October 18, 2019 at 5:00 p.m. Central Time; (iii) Auction on October 22, 2019 at 10:00 a.m. Central Time at the offices of Porter Hedges LLP, 1000 Main

---

[5] Because it is uncertain whether there are any other parties interested in purchasing the Debtors' assets, the Bid Procedures includes a deadline by which interested parties must sign an acceptable non-disclosure agreement. If no party executes a non-disclosure agreement by this deadline, the Debtors may reschedule the Sale Hearing for 14 days after the expiration of the NDA Deadline.

Street, 36th Floor, Houston, Texas 77002; and (iv) Sale Hearing on October 25, 2019 at _____ Central Time.

## RELIEF REQUESTED

**A.     The Bid Procedures, Form of Stalking Horse Agreement, and Form of Notices**

16.     The Debtors seek approval of (i) the bid procedures attached as **Exhibit 1** to the Bid Procedures Order (the "Bid Procedures"), (ii) the form of Stalking Horse Agreement attached as **Exhibit 2** to the Bid Procedures Order, (iii) the form of the notice of the auction attached as **Exhibit 3** to the Bid Procedures Order (the "Auction Notice"), and (iv) the Cure Notice (as defined below) attached as **Exhibit 4** to the Bid Procedures Order.

17.     The Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Stalking Horse Agreement and the terms of the Debtors' agreed use of cash collateral and proposed postpetition financing. The Bid Procedures are the result of good faith, arm's length negotiations with the Stalking Horse Bidder. The Bid Procedures are transparent and represent a fair balance of the competing issues present in this case.

**B.     Notice Relating to Potential Assumption and Assignment of Executory Contracts and Unexpired Leases**

18.     As part of the Sale, the Debtors seek authority to assume and assign certain executory contracts and/or unexpired leases (the "Desired 365 Contracts") to the Stalking Horse Bidder or any other successful bidder.

19.     With respect to the Desired 365 Contracts, the Debtors respectfully request approval of the following notice procedures:

  a.  No later than fourteen (14) days prior to the hearing to approve the Sale (the "Sale Hearing"), the Debtors will file with the Court and serve on each party to a Desired 365 Contract a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the

"Cure Notice"). The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to Bankruptcy Code section 365 (the "Cure Amount"), and notify each party that such party's lease or contract may be assumed and assigned to the successful bidder to be identified at the conclusion of the auction.

b.  No later than seven (7) days prior to the Sale Hearing, any objection to the Cure Amount must be filed with the Court (the "Cure Objection Deadline"). Any objection to the Cure Amount must state with specificity what cure the party to the Desired 365 Contract believes is required with appropriate documentation in support thereof. If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Desired 365 Contract or other document as of the date of the Cure Notice; the non-debtor party to the Desired 365 Contract shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtor party shall be forever barred, estopped and enjoined from asserting or claiming against the Debtors or the Stalking Horse Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Desired 365 Contract or that there is any objection or defense to the assumption and assignment of such Desired 365 Contract, including any argument that there exist conditions to assumption and assignment that must be satisfied under such Desired 365 Contract or that any required consent to assignment has not been given; and the non-debtor party to such Desired 365 Contract shall be forever barred from objecting to the adequacy of the Stalking Horse Bidder's adequate assurance of future performance and that there exists any other basis on which to object to such assumption and assignment.

## C.    Breakup Fee and Minimum Overbid

20.    In connection with approval of the Stalking Horse Agreement, the Debtors seek approval of the following bid protections (collectively, the "Bid Protections").

21.    If the Debtors consummate a sale under the Bid Procedures to a purchaser who is not the Stalking Horse Bidder, it shall pay (in cash) to the Stalking Horse Bidder, who will then send the funds directly to Alliance, an amount equal to (i) $500,000 to the extent net cash proceeds from the consummation of the sale to the bidder are less than or equal to $75,000,000 and the Stalking Horse Bidder did not withdraw its Stalking Horse Bid to the extent permitted to do so under the Stalking Horse Agreement or the Bid Procedures, (ii) $1,000,000 to the extent

net cash proceeds from the consummation of the sale to the bidder are less than or equal to $75,000,000 and the Stalking Horse Bidder withdraws its Stalking Horse Bid to the extent permitted to do so under the Stalking Horse Agreement or the Bid Procedures, or (iii) $2,000,000 to the extent net cash proceeds from the consummation of the sale to the bidder are greater than $75,000,000 (the "Breakup Fee"). Because Alliance is incurring substantial fees and expenses in connection with the Stalking Horse Agreement but has no privity of contract with a Debtor, White Oak has negotiated an agreement for it—not the Debtors—to pay Alliance a fee in similar amounts to the Breakup Fee on certain terms and conditions (including White Oak's voluntary withdrawal of its bid). A copy of that agreement is attached hereto as **Exhibit A**.[6]

22.     In order to be a qualified bid, a third party's minimum initial overbid must be in an amount equal to or in excess of the purchase price under the Stalking Horse Agreement, plus the Breakup Fee and an initial bid increment of $250,000.00. At the auction, each successive overbid must be in the minimum increment of $250,000.00.

23.     The Debtors believe that the Bid Protections, including the Breakup Fee, are appropriate under the circumstances as a cost of ensuring that the Debtors' bankruptcy estates maximize value for the Purchased Assets, while also providing the Debtors with the opportunity to continue their marketing efforts. The Debtors believe that the Bid Protections are reasonable for a transaction of the type and size contemplated, and in light of the attendant risks present in this case.

24.     The determination of whether a breakup fee should be allowed is based on whether the fees and expenses are necessary to preserve the value of the estate. *See In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999). Courts have evaluated such

---

[6] The Debtors do not seek the Court's approval of this agreement between non-Debtor parties, but are submitting it with the Motion in to provide notice of certain agreements ancillary to the Stalking Horse Agreement.

arrangements under the business judgment rule standard. *See In re ASARCO, LLC*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988); *Official Comm. Of Subordinated Bondholders v. Inte-grated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993); *see also In re Twenver, Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992). The considerations that underlie a debtor's business judgment to pay a break-up fee or expense reimbursement are relevant to the Court's determination of the request. *Id.*

25.     It is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Res., Inc.*, 147 B.R. at 658. In the instant case, the proposed Bid Protections have been the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder. Furthermore, the Debtors believe that a smaller amount for the Bid Protections would not be sufficient to entice a party to serve as a stalking horse bidder based on the speed with which the parties were required to move, the risk, effort, and expenses involved in this sale, and the bid protections are within the range of other break-up fees approved by other bankruptcy courts. *See, e.g., In re Geokinetics Inc., et al.*, Case No. 18-33410 (DRJ) (Bankr. S.D. Tex. July 2, 2018) (approving breakup fee of 5%); *In re Cobalt International Energy, Inc., et al.*, Case No. 17-36709 (MI) (Bankr. S.D. Tex. Jan. 25, 2018) (court authorized payment of Bid Protections up to an aggregate of 3% of the purchase price); *In re Stone Energy Corp., et al.*, Case No. 16-36390

(court approved break-up fee of 3% and expense reimbursement of 1%"); Hr'g Tr. 31:8–9, *In re First Place Fin. Corp.*, No. 12-12961 (BLS) (Bankr. D. Del. Nov. 15, 2012) ("courts in this jurisdiction have gone . . . up to five percent [of the purchase price]" for a break-up fee alone); *In re Nirvanix, Inc.*, Case No. 13-12595 (BLS) (Bankr. D. Del. Oct. 23, 2013), (approving total bid protections of 11%—comprising a $150,000 break-up fee and $150,000 expense reimbursement for a $2,800,000 stalking horse bid); *In re First Place Fin. Corp.*, Case No. 12- 12961 (BLS) (Bankr. D. Del. Nov. 26, 2012) (approving total bid protections of 6.6%—comprising a $3 million break-up fee and a $1 million expense reimbursement on a transaction with $60 million in aggregate consideration.); *In re Hub Holding Corp., et al.*, Case No. 09- 11770 (PJW) (Bankr. D. Del. June 30, 2009) (approving total bid protections of 6.43%—comprising a $2,880,000 break-up fee and $1,750,000 expense reimbursement for a $72,000,000 stalking horse bid.); *In re Fluid Routing Solutions Intermediate Holding Corp., et al.*, Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009), (approving total bid protections of 6.82%—comprising a $750,000 break-up for an $11,000,000 stalking horse bid); *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. April 8, 2004) (court approved break-up fee equal to 5% of the purchase price); *In re TransCom USA Management Co., L.P.*, Case No. 01-35158 (KKB) (Bankr. S.D. Tex. February 12, 2002) (court approved a break-up fee of more than 3.6% of the purchase price for the assets).

**D.      The Sale of Assets is an Exercise of the Debtors' Sound Business Judgment**

26.      Bankruptcy Code section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate; however, bankruptcy courts in this District and elsewhere have required that the authorization of such use, sale, or lease of property of the estate out of the ordinary course of business be based upon sound business justification. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc., et al. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a

debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *West v. Flores (In re St. Marie Clinic PA)*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988). Once the Debtors articulate a valid business justification, the business judgment rule "'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), rev'd on other grounds); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *Committee of Asbestos-related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (". . . a presumption of reasonableness attaches to a Debtor's management decisions.").

27.     The Debtors have a sound business justification for selling the Purchased Assets under the terms of the Stalking Horse Agreement, and pursuant to a competitive bidding process consistent with the Bid Procedures.

28.     The Debtors submit that the Stalking Horse Agreement (or, if the Stalking Horse Bidder is not the prevailing bidder, an alternative bid resulting from the Bid Procedures) will constitute the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors'

determination to sell the Purchased Assets under the terms of the Stalking Horse Agreement and through a competitive bidding process as provided for in the Bid Procedures is a valid and sound exercise of the Debtors' business judgment.[7]

29.     Accordingly, the Debtors believe that they have proposed a fair process for obtaining the highest and best offer and sale of the Purchased Assets for the benefit of the Debtors' estates and their creditors.

**E.      Request to Approve Sale Free and Clear Pursuant to 11 U.S.C. § 363(f)**

30.     By this Motion, the Debtors also request that the Court approve the sale of the Purchased Assets to the Stalking Horse Bidder or the successful bidder pursuant to Bankruptcy Code sections 105, 363, and 365 of the Bankruptcy Code. This portion of the relief is requested to be entered after the Sale Hearing, pursuant to a form of Sale Order to be filed prior to the Sale Hearing. The Debtors submit that the sale of the Purchased Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement, or such Stalking Horse Agreement as the Debtors may reach with the successful bidder, is in the best interest of the Debtors' estates and should be approved.

31.     A debtor should be authorized to sell assets outside of the ordinary course of business pursuant to Bankruptcy Code section 363 and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so. *See, e.g., Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070–71 (2d Cir. 1983); *see also In re Gulf Oil Corp.*, 404 B.R. 407, 418 (Bankr. S.D. Tex. 2009). Factors considered in approving a sale outside of plan include (i) the business justification, (ii) the

---

[7] White Oak and the Debtors' ultimate shareholders, Thomas Clarke, Ana Clarke and David Wiley, have entered into an agreement, a copy of which is attached hereto as **Exhibit B**, providing (on certain terms and conditions) for a reduction of their personal guaranties of the Debtors' obligations to White Oak to an aggregate maximum liability of $20,000,000. The Debtors do not seek the Court's approval of this agreement between non-Debtor parties, but are submitting it with the Motion in to provide notice of certain agreements ancillary to the Stalking Horse Agreement.

amount of elapsed time since the filing date, (iii) whether the proposed bid procedures and stalking horse agreement facilitate competitive bidding, (iv) whether the assets have been marketed, (v) the likelihood that a plan will be confirmed in the near future, (vi) the effect of disposition on the future plan, and (vii) whether the assets are increasing or decreasing in value. *In re Lionel Corp.*, 722 F.2d at 1071.

32.    The disposition of the Purchased Assets will not control the terms of a future plan. The allocation of the proceeds will be determined by a plan and not by the terms of the Stalking Horse Agreement. Further, a timely sale is important in this case in order to preserve the value of the Debtors' assets and to ensure that the Debtors have sufficient funding to run an appropriate sales process.

33.    The Debtors request that the Court approve the sale of the Purchased Assets free and clear of all liens, claims, and encumbrances (except for the Permitted Encumbrances). In evaluating such a sale, a court must balance the need for flexibility with the concern of affected creditors. *See In re Terrace Gardens Park P'ship*, 96 B.R. 707, 715 (Bankr. W.D. Tex. 1989). The Court must also determine that creditors' lien rights are adequately protected and that the offered price is the highest price and/or best terms obtainable under the circumstances in the particular case. *In re Terrace Gardens Park P'ship*, 96 B.R. at 715; *In re Beker Indus. Corp.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y. 1986).

34.    The Debtors maintain that one of the five subsections of section 363(f) will be satisfied for each interest and, therefore, the Debtors may sell the Purchased Assets free and clear of all liens, claims, and encumbrances. Specifically, the Debtors submit that to the extent the holder of any such lien, claim, or encumbrance does not consent pursuant to section 363(f)(2) of the Bankruptcy Code, the Debtors will be able to establish that one of the other subsections of

363(f) applies. Notably, any liens on the Debtors' assets that will be outstanding at the time of the sale are either Permitted Encumbrances that will not be subject to the "free and clear" provisions of the Stalking Horse Agreement and Sale Order, or the liens are junior to the Stalking Horse Bidder's liens and thus are unsecured pursuant to section 506(a) of the Bankruptcy Code, thereby satisfying section 363(f)(1). Accordingly, the Debtors request that the Purchased Assets be sold to the Stalking Horse Bidder or the successful bidder free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the proceeds of the sale of the Purchased Assets.

**F.      Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases**

35.      To enhance the value to the Debtors of the proposed sale, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Desired 365 Contracts to the Stalking Horse Bidder or the successful bidders. The Debtors further request that the Sale Order provide that the Desired 365 Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or the successful bidder notwithstanding any provisions in the Desired 365 Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

36.      Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Adequate assurance may be

provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

37.     The Debtors will present evidence at the Sale Hearing to demonstrate the financial credibility, willingness, and ability of the Stalking Horse Bidder or the successful bidder to perform under the Desired 365 Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or the successful bidder to provide adequate assurance of future performance under the Desired 365 Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtors will give notice to all parties to the Desired 365 Contracts of their intention to assume the Desired 365 Contracts and what the Debtors believe are the Cure Amounts. Accordingly, the Court should authorize the Debtors to assume and assign the Desired 365 Contracts to the Stalking Horse Bidder or the successful bidder.

## <u>WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)</u>

38.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 (fourteen) days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d). Here, an expeditious closing of a sale is necessary and appropriate to maximize value for the estates

and is a requirement under the Debtors' postpetition financing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

39.     Accordingly, the Debtors request that the Court (i) enter the Bid Procedures Order; (ii) schedule the Sale Hearing to consider the Sale Order; and (iii) grant the Debtors other just relief.

## NOTICE

40.     Notice of this Motion shall be given to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) counsel to the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases, if appointed; (iii) counsel to the agent under the Debtors' first-lien credit facility and the Debtors' debtor in possession credit facility; (iv) counsel to the agent under the Debtors' second-lien credit facility; (v) the Debtors' 30 largest unsecured creditors on a consolidated basis; (vi) the United States Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) all known affected federal, state, and local regulatory, and taxing authorities; (ix) the office of the attorneys general for the states in which the Debtors operate; (x) any party known to have asserted any lien encumbrance, claim, or interest in the Purchased Assets; (xi) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the three (3) months preceding the date hereof; (xii) all known holders of liens, encumbrances, and other claims secured by the Purchased Assets; (xiii) the counterparties to Assigned Contracts; (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and (xv) any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## CONCLUSION

41.     The Debtors respectfully request that the Court enter the Bid Procedures Order at

a hearing on September 10, 2019 and the Sale Order after the Sale Hearing and grant such other

and further relief as is just and proper.

Dated: August 26, 2019.
      Houston, Texas

                          **PORTER HEDGES LLP**

              By:     */s/ John F. Higgins*
                          John F. Higgins (TX 09597500)
                          M. Shane Johnson (TX 24083263)
                          Genevieve M. Graham (TX 24085340)
                          1000 Main Street, 36th Floor
                          Houston, Texas 77002
                          Telephone: (713) 226-6000
                          Fax: (713) 226-6248

                          **PROPOSED COUNSEL FOR DEBTORS
                          AND DEBTORS IN POSSESSION**