UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EPIC COMPANIES, LLC, | § | Case No. 19-34752 |
| | § | |
| Debtors.[1] | § | (Joint Administration Pending) |
| | § | (Emergency Hearing Requested) |

## DECLARATION OF KELTON C. TONN IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Kelton C. Tonn, being duly sworn, depose and say:

1.      I am the Legal Officer at Epic Companies, LLC ("Epic") and certain of its subsidiaries, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I joined Epic in March of 2018 and I have served as Vice President and Legal Officer since July 22, 2019. I previously served as Vice President, General Counsel and Secretary from March 8, 2018 until October 29, 2018, and from October 29, 2018 until July 22, 2019, I served as Vice President and Secretary. During my tenure, I was on the payroll of Epic from March 3, 2018, until December 31, 2018, and again from June 26, 2019 until the present. Between January 1, 2019, and June 22, 2019, I was on the payroll of Clarke Investments, LLC.

3.      Prior to joining Epic, I worked at TETRA Technologies, LLC ("TETRA Technologies") for approximately six and one-half years, as Senior Counsel, where my main

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Epic Companies, LLC (1473), Epic Diving & Marine Services, LLC (2501), Epic Applied Technologies, LLC (5844), EPIC Specialty Services, LLC (8547), Epic Alabama Steel, LLC (6835), Epic San Francisco Shipyard, LLC (5763) and Zuma Rock Energy Services, LLC (1022). The address of the Debtors' headquarters is: 1080 Eldridge Parkway, Suite 1300, Houston, Texas 77077.

internal client was TETRA Technologies' offshore services division. My legal career prior to TETRA Technologies included approximately five years as in-house counsel with McDermott International, Inc. (formerly J. Ray McDermott) and six years in private practice at Coats, Rose, Yale Ryman and Lee, PC, all in Houston, Texas.

4.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' senior management, my review of relevant documents or, based on my experience and knowledge of the Debtors' operations and financial conditions, my opinion. In making this Declaration, I have relied, in part, on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5.      To minimize any disruption to the Debtors' operations and to ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the chapter 11 cases (the "Chapter 11 Cases").[2] I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings.

6.      This Declaration is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

2

8398799v9

## PART I – BACKGROUND

### A. Overview

7.      The Debtors filed these Chapter 11 Cases to market and sell the Debtors' business as a going concern. For weeks prior to August 26, 2019 (the "Petition Date"), the Debtors and their fiduciaries worked to secure postpetition financing to provide sufficient liquidity to support the Debtors' business, pay their employees and to protect their critical stakeholders during the marketing process. Had Epic's prepetition secured lenders not agreed to finance the Debtors' operations during the postpetition marketing period, the Debtors would have been forced to terminate operations, lay off their remaining employees and liquidate in the near term, thereby resulting in irreparable consequences for its stakeholders.

### B. Proposed Sale

8.      The Debtors have proposed a sale of substantially all of their assets in a 65-day sale process. White Oak Global Advisors, LLC ("White Oak") is the proposed stalking horse bidder and will credit bid $48,900,000 of its pre and postpetition debt and assume $40,000,000 of the indebtedness evidenced by the Prior Junior Loan Agreement (as defined below). A quick resolution to these cases is essential to the preservation of the value of the Debtors' assets and estates.

9.      Upon closing the sale of the Purchased Assets, White Oak will then sell certain of the assets to Alliance Energy Services, LLC for a cash purchase price of $40 million and an assumption of $35 million of the indebtedness evidenced by the Prior Junior Loan Agreement, among other terms, in a separate transaction financed by White Oak, and is in discussions regarding the sale of other portions of the assets to other third parties on terms to be agreed.

3

### C. The Debtors' Business

10.     The Debtors together formed a full-service provider to the global decommissioning, installation and maintenance markets headquartered in Houston, Texas. The Debtors' services included heavy lift, diving and marine, specialty cutting and well plugging and abandonment services. As of the Petition Date, the Debtors have limited ongoing operations.

11.     Epic is a privately held company formed in March 2018 from the divestiture of Tetra Technologies' offshore services division, which included the acquisition of TSB Offshore, Inc. ("TSB Offshore") and Debtor entities Tetra Applied Technologies, LLC (now known as Epic Applied Technologies, LLC, "Epic Applied") and Epic Diving & Marine Services, LLC ("Epic Diving"). Throughout 2018, Epic expanded its service lines with the acquisition in August of certain assets and capabilities acquired from Wrights Well Control Services Inc. ("Wrights"), as well as assets and capabilities acquired from Ranger Offshore Inc. ("Ranger"), and in October with the acquisition of the BAE Mobile, Alabama Shipyard (renamed Epic Alabama Shipyard, LLC, "Epic Alabama Shipyard"). In February of 2019, Epic entered the metals recycling business and formed Epic Recycling Services, LLC ("Epic Recycling") and Epic Alabama Recyclers, LLC ("Epic Alabama Recyclers").

12.     In April of 2019, Epic divested TSB Offshore. In July of 2019, White Oak foreclosed on Epic's equity interests in Epic Alabama Holdings, LLC ("EPIC Alabama Holdings"), Epic Maritime Asset Holdings, LLC ("Epic Maritime"), and Navarro Capital Partners, LLC ("Navarro"). White Oak then transferred the equity interests in Epic Alabama Holdings and Epic Maritime to Orinoco Natural Resources, LLC ("Orinoco") and the equity interests in Navarro to Oakridge Energy Partners LLC ("Oakridge").

4

## D. The Debtors' Corporate Structure

13. The Debtors' corporate structure prior to the lender foreclosures in July 2019 is reflected in the organization chart below:

**EPIC Companies, LLC**

8398799v9



14.     The Debtors' full current corporate structure is reflected in the organizational chart

below:



15.     As part of their operations, the Debtors own the following heavy lift and diving

vessels:

     a.   The <u>DB Hedron</u> is a world-class derrick barge with a 1,763-ton (1,600-metric)
        capacity, fully revolving crane, and accommodations for 300 personnel. This
        powerful barge, along with experienced crews, offers valuable solutions for heavy
        lift, decommissioning, construction, and installation projects.

8398799v9



*Epic Hedron Derrick Barge*

b. The <u>DB Arapaho</u> is an 800-ton (726 metric) capacity conventional derrick barge that is ideal for a variety of offshore projects. The Arapaho's experienced crew and reliable equipment contribute to successful solutions for offshore decommissioning, installation, and construction challenges.



*Epic Arapaho Derrick Barge*

c. The <u>EPIC Explorer</u> and its experienced crew can tackle projects that require a 4-point anchor vessel and saturation diving capabilities—including turnkey wellhead removals, mudline tree abandonments and removals, and site clearance, as well as pipeline reroutes, spool installations, and hurricane remedial work.



*Epic Explorer*

7

16.     Epic Applied owns the Hedron and Arapaho, and Epic Diving owns the Explorer. Additionally, the Debtors' assets include various diving and well services equipment, including coil-tubing units, EOT cutting tools, and well equipment, as well as intellectual property for certain equipment and cutting tools patents.

17.     Finally, Epic owns unencumbered real property located at 168, 306, and 403 Menard Road in Houma, Louisiana (the "Menard Road Property") and unencumbered real property located at 600 Thompson Road in Houma, Louisiana (the "Thompson Road Property"). The Menard Road Property, as well as additional adjacent leased tracts are currently utilized by Epic Recycling. The Thompson Road Property is not currently in use. The Debtors also own real property located at 309 Dickson Road in Houma, Louisiana (the "Dickson Road Property"), which is subject to White Oak's liens. The Dickson Road Property was utilized primarily by Epic's heavy lift and well plugging and abandonment operations personnel and for equipment storage.

### E. The Debtors' Management

18.     The Debtors' remaining core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Jeffrey Varsalone | Chief Restructuring Officer |
| Jennifer Bell | Vice President |
| Kelton Tonn | Vice President, Legal Officer |

### F. The Debtors' Capital Structure

19.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

20.     The Debtors' prepetition capital structure is summarized in the table below:

8

| Obligation | Priority Against Debtors[3] | Amount |
|---|---|---|
| Restated Senior Loans | First Lien | $50,295,463.69 |
| Restated Junior Loans | Second Lien | $65,340,299.28 |
| Trade and Other Secured Claims | Secured/Unsecured[4] | $30,000,000 |

### i. Prior Senior Loan Agreement

21.     Epic and certain subsidiaries were parties to a Loan and Security Agreement dated as of July 20, 2018 (as amended, the "Prior Senior Loan Agreement"), among White Oak, as administrative agent, the lenders party thereto (the "Epic Senior Lenders"), Epic and Epic Maritime, as borrowers, and the following as guarantors, all of which were (or became) subsidiaries of Epic: (i) Epic Diving, (ii) Epic Applied Technologies, (iii) TSB Offshore, (iv) Epic Alabama Holdings, LLC, (v) Epic Alabama Maritime Assets, LLC ("Epic Alabama Maritime"), (vi) Epic Alabama Shipyard, (vii) Epic Recycling, (viii) Epic Alabama Recyclers, (ix) Cedar Creek Aviation, LLC ("Cedar Creek"), (x) Epic Specialty Services, LLC ("Epic Specialty Services"), (xi) King Aire, Inc. ("King Aire"), (xii) Zuma Rock Energy Services, LLC ("Zuma"), (xiii) Navarro, (xiv) Ranger Offshore International, LLC ("Ranger Offshore"), (xv) TSB Holding Company, LLC ("TSB HoldCo"), and (xvi) ERP Environmental Fund, Inc. ("ERP"). The amount initially advanced under the Prior Senior Loan Agreement was $45,000,000. Thomas Clarke, Ana M. Clarke, and David Wiley also personally guaranteed the obligations under the Prior Senior Loan Agreement.

22.     The obligations under the Prior Senior Loan Agreement were secured by, among other things, substantially all of the Debtors' assets. The Prior Senior Loan Agreement was

---

[3] This table is for illustration and summary purposes only. The Debtors do not admit to the validity, priority, or allowance of any claim, lien or interest in property and reserve rights in relation to such issues.

[4] As stated below, certain creditors may be able to assert maritime liens against the Debtors.

8398799v9

subsequently amended from time to time in order to continue to provide funding for the Debtors' operations.

23.     As of July 22, 2019, the aggregate amount of all obligations under the Prior Senior Loan Agreement was $106,902,442.86, including protective advances made under the Prior Senior Loan Agreement in the amount of $1,469,611.08.

### ii.  Prior Junior Loan Agreement

24.     Epic and certain subsidiaries were also parties to a Second Amended and Restated Loan and Security Agreement dated as of April 5, 2019, as amended (the "Prior Junior Loan Agreement"), among Acqua Liana Capital Partners, LLC, as administrative agent for the lenders ("Acqua Liana"), the lenders party thereto (the "Epic Junior Lenders"), Ranger Offshore, Inc., Navarro and Zuma, as borrowers, Epic, as parent guarantor, and the following subsidiaries of Epic as guarantors: (i) Epic Diving, (ii) Epic Applied Technologies, (iii) TSB Offshore, (iv) Epic Alabama Holdings, (v) Epic Alabama Maritime, (vi) Epic Alabama Shipyard, (vii) Cedar Creek, (viii) Epic Specialty Services, (ix) King Aire, (x) Ranger Offshore, (xi) Epic Maritime, and (xii) Ranger International, Ltd.

25.     The obligations under the Prior Junior Loan Agreement were secured by, among other things, substantially all of the Debtors' assets.

26.     As of July 22, 2019, the aggregate amount of all obligations under the Prior Junior Loan Agreement was $124,827,970.24.

### iii.  Restructuring of Equity Interests in Epic Alabama Holdings, Epic Maritime and Navarro Capital Partners, LLC

27.     On July 22, 2019, White Oak exercised its secured creditor remedies under the Prior Senior Loan Agreement with respect to the equity interests in (i) Epic Alabama Holdings, (ii) Epic Maritime, and (iii) Navarro. As evidenced by that certain *Proposal Under Sections 9-620 and 9-*

10

*621 of the New York Uniform Commercial Code—Secured Transactions to Accept Certain Collateral in Partial Satisfaction of the Obligation it Secures*, dated July 22, 2019, Epic agreed to transfer equity interests from Epic to White Oak in exchange for the reduction of $100,000 of Epic's debt obligations to White Oak. White Oak then transferred the equity interests in Epic Alabama Holdings and Epic Maritime to Orinoco and the equity interests in Navarro to Oakridge. As a result, Epic no longer owns (either directly or indirectly) the following entities: (i) Epic Alabama Holdings, (ii) Epic Maritime, (iii) Epic Alabama Maritime, (iv) Epic Alabama Shipyard, (v) Epic Recycling, (vi) Epic Alabama Recyclers, (vii) Cedar Creek, (viii) Navarro, (ix) Ranger Offshore, (x) Ranger Offshore Mexico, S. de R.L. de C.V., (xi) Remuda Shipping S. de R.L. de C.V., and (xii) Remuda Offshore S. de R.L. de C.V.

### iv. *Restated Prior Senior Loan Agreement*

28.     On July 22, 2019, in connection with the restructuring of Epic and its subsidiaries and White Oaks' exercise of its secured creditor remedies under the Prior Senior Loan Agreement, White Oak and the Epic Senior Lenders agreed to allocate the existing obligations under the Prior Senior Loan Agreement to Epic and certain subsidiaries pursuant to three separate senior loan agreements:

   a.  Amended and Restated Loan and Security Agreement, dated as of July 22, 2019, as further amended from time to time (the "Epic Restated Senior Loan"), among White Oak, the Epic Senior Lenders, Epic, as borrower, and the following entities as guarantors: (i) Epic Diving, (ii) Epic Applied Technologies, (iii) TSB Offshore, (iv) Epic Specialty Services, LLC, (v) Epic San Francisco Shipyard, LLC, (vi) King Aire, (vii) Zuma, (viii) Epic Alabama Steel, LLC, (ix) TSB HoldCo, and (x) ERP. Under the Epic Restated Senior Loan, the Epic Senior Lenders are deemed to have made (a) a term loan in the amount of $45,432,831.78 and (b) protective advances in the amount of $1,469,611.08.

   b.  Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (the "Shipyard Restated Senior Loan"), among White Oak, the Epic Senior Lenders, Epic Alabama Maritime, as borrower, and the following entities as guarantors: (i) Epic Alabama Holdings, (ii) Epic Maritime, (iii) Epic Alabama Shipyard, (iv) Epic Recycling, (v) Epic Alabama Recyclers, and (v) ERP. Under

the Shipyard Restated Senior Loan, the Epic Senior Lenders are deemed to have made a term loan in the amount of $45,000,000.

c. Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (the "Navarro Restated Senior Loan", and collectively with the Epic Restated Senior Loan and the Shipyard Restated Senior Loan, the "Restated Senior Loans"), among White Oak, the Epic Senior Lenders, Navarro, as borrower, and the following subsidiaries of Epic as guarantors: (i) Ranger Offshore and (ii) ERP. Under the Navarro Restated Senior Loan, the Epic Senior Lenders are deemed to have made a term loan in the amount of $15,000,000.

29.     Each of the Restated Senior Loans is secured by a security interest in substantially all of the assets of the borrower and the guarantors that are a party thereto, as well as a pledge of the equity interests in the borrower and guarantors party thereto. The Menard Road Property and the Thompson Road Property are not pledged as collateral for the Restated Senior Loans.

30.     Each of the Restated Senior Loans is also guaranteed by Thomas M. Clarke, Ann M. Clarke and David A. Wiley.

### v.   Subsequent Amendments to the Epic Restated Senior Loan

31.     The Epic Restated Senior Loan has been amended six times to provide funding for the Debtors' critical payables via protective advances, as follows.

a. First Amendment dated July 26, 2019:  The Epic Senior Lenders provided protective advances in the aggregate principal amount of $357,340.68

b. Second Amendment dated August 5, 2019:  The Epic Senior Lenders provided protective advances in the aggregate principal amount of $872,220.36.

c. Third Amendment dated August 8, 2019:  The Epic Senior Lenders provided protective advances in the aggregate principal amount of $2,143,150.72.

d. Fourth Amendment dated August 14, 2019:  The Epic Senior Lenders provided protective advances in the aggregate principal amount of $718,372.75.

e. Fifth Amendment dated August 22, 2019:  The Epic Senior Lenders provided protective advances in the aggregate principal amount of $1,000,000.00.

f. Sixth Amendment dated August 26, 2019:  The Epic Senior Lenders provided protective advances in the aggregate principal amount of $462,431.35.

### vi. Restated Junior Loan and Security Agreements with Acqua Liana Capital Partners, LLC

32.     On July 22, 2019, in connection with the restructuring of Epic and its subsidiaries, Acqua Liana and the Epic Junior Lenders agreed to allocate the existing obligations under the Prior Junior Loan Agreement to Epic and its subsidiaries pursuant to three separate restated junior loan agreements:

      a.  Third Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (the "Epic Restated Junior Loan"), among Acqua Liana, the Epic Junior Lenders, Epic, as borrower, and the following entities as guarantors: (i) Epic Diving, (ii) Epic Applied Technologies, (iii) TSB Offshore, (iv) Epic Specialty Services, LLC, (v) Epic San Francisco Shipyard, LLC, (vi) King Aire, (vii) Zuma, (viii) Epic Alabama Steel, LLC, (ix) TSB HoldCo, and (x) ERP. Under the Epic Restated Junior Loan, the Epic Junior Lenders were deemed to have made a term loan in the amount of $64,827,970.24.

      b.  Third Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (the "Shipyard Restated Junior Loan"), among Acqua Liana, the Epic Junior Lenders, Epic Alabama Maritime, as borrower, and the following entities as guarantors: (i) Epic Alabama Holdings, (ii) Epic Maritime, (iii) Epic Alabama Shipyard, (iv) Epic Recycling, (v) Epic Alabama Recyclers, and (vi) ERP. Under the Shipyard Restated Junior Loan, the Epic Junior Lenders were deemed to have made a term loan in the amount of $35,000,000.

      c.  Third Amended and Restated Loan and Security Agreement, dated as of July 22, 2019 (the "Navarro Restated Junior Loan", and collectively with the Epic Restated Junior Loan and the Shipyard Restated Junior Loan, the "Restated Junior Loans"), among Acqua Liana, the Epic Junior Lenders, Navarro, as borrower, and the following entities as guarantors: (i) Ranger Offshore and (ii) ERP. Under the Navarro Restated Junior Loan, the Epic Junior Lenders were deemed to have made a term loan in the amount of $25,000,000.

33.     Each of the Restated Junior Loans is secured by a security interest in substantially all of the assets of the borrower and guarantors party thereto, except for the Menard Road Property and the Thompson Road Property, as well as a pledge of the equity interests in the borrower and guarantors party thereto.

34.     Further, the obligations under the Epic Restated Junior Loan are secured by a mortgage by Epic Alabama Maritime in a certain shipyard property.

8398799v9

35.     The obligations under the Restated Junior Loans are further secured by a pledge by Stockbridge Natural Resources, LLC of the equity interests in Sanare Energy Partners, LLC.

### vii.   Note Payable from Acqua Liana to White Oak

36.     As part of the restructuring transaction, pursuant to the Third Amended and Restated Senior Secured Promissory Note of Acqua Liana Capital Partners, LLC dated July 22, 2019, Acqua Liana promised to pay White Oak, for the benefit of certain holders, the amount of $124,827,970.24, which is the aggregate principal amount outstanding under the Restated Junior Loans.

37.     Acqua Liana's obligations under the Third Amended and Restated Senior Secured Promissory Note are guaranteed by personal guarantees from Thomas M. Clarke, Ann M. Clarke and David A. Wiley and are secured by substantially all of the assets of Acqua Liana as well as a collateral assignment of the Restated Junior Loans.

### viii.   Trade and Other Unsecured Claims

38.     The Debtors estimate that the trade and other unsecured claims total in excess of $30 million as of the Petition Date. Some of the Debtors' trade creditors may be able to assert maritime liens against the Debtors.

### ix.   Equity

39.     Epic is owned 50% by Orinoco and 50% by Oakridge.

## E. Litigation Against the Vessels

40.     The Debtors are involved in various lawsuits, including several suits against the Debtors' vessels. The vessel litigation is summarized as follows:

      a.  *Dan Bunkering (America), Inc v. EPIC Hedron, In rem*, case no. 2019-cv-00413, pending in the United States District Court for the Southern District of Alabama, for the arrest of the Epic Hedron. The arrest warrant was served on July 24, 2019.

14

b. *Dan Bunkering (America), Inc v. EPIC Arapaho, In rem*, case no. 2019-cv-11897, pending in the United States District Court for the Eastern District of Louisiana, for the arrest of the Epic Arapaho.

c. *Garber Bros. Inc. v. D/B Arapaho; et al/ Epic Companies LLC*, case no. 2019-cv-11786, pending in the United States District Court for the Eastern District of Louisiana, for the arrest of the Derrick Barge Arapaho and various scrap assets. The Debtors were served on August 2, 2019.

d. *Dan Bunkering (America), Inc v. EPIC Explorer, In rem*, case no. 2019-cv-11741, pending in the United States District Court for the Eastern District of Louisiana, for the arrest of the Epic Explorer.

**F. Events Leading to Chapter 11 Cases**

41.     Like many in their industry, the downturn in oil and natural gas prices and other industry-related challenges negatively impacted the Debtors' liquidity position. As a result, on or around July 19, 2019, the Debtors defaulted under the Prior Senior Loan Agreement and Existing Junior Loan Agreement. On July 19, 2019, White Oak swept the Debtors' bank accounts and continue to sweep the accounts daily. Since that time, White Oak has made a number of protective advances which have been used to fund the Debtors' operations.

42.     On July 10, 2019, White Oak informed the Debtors' management that it would not provide any additional funding. As a result, on July 15, 2019, the Debtors terminated approximately 400 employees.

**a. Involuntary Bankruptcy Case**

43.     On August 2, 2019, Scurlock Electric, L.L.C., Preferred Sandblasting, L.L.C., and Top Drive Services, L.L.C. filed an involuntary chapter 7 petition against Epic in the United States Bankruptcy Court for the Eastern District of Louisiana, New Orleans Division (the "Louisiana Bankruptcy Court"), Case No. 19-12086 (the "Involuntary Case"). Epic is the only proposed debtor in the involuntary. Contemporaneously with the filing of the Debtors' voluntary petitions, EPIC filed a motion to dismiss the Involuntary Case, or, in the alternative, requesting the Louisiana

15

8398799v9

Bankruptcy Court to transfer venue of the EPIC Involuntary Case to this Court. As of the Petition Date, the Louisiana Bankruptcy Court has not entered an order for relief on the Involuntary Case.

## PART II. FIRST DAY PLEADINGS[5]

### A.   Administrative and Procedural First Day Pleadings

#### i.   Joint Administration Motion

44.   I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

#### ii.   Consolidated Creditor List and Schedules Extension Motion

45.   Under the circumstances, a seven-day extension (giving the Debtors 21 days from the Petition Date) to file the Schedules and Statements is warranted. The Debtors' record keeping makes separating liabilities by debtor entity difficult and time consuming. To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' assets. Among other reasons, because of (i) the size and scope of the Debtors' prior businesses, (ii) the limited staffing available to perform the required internal review of their accounts and affairs, and (iii) the focus of attention to matters incident to the commencement of these Chapter 11 Cases, the Debtors will not be able to assemble all of the information necessary to complete and file the Schedules and Statements by the applicable deadline.

---

[5] Capitalized terms not otherwise defined in this section have the meanings ascribed to them in the applicable motion.

8398799v9

46.     The Debtors, while separate legal entities, have a large number of common creditors. Filing separate lists of the top 20 unsecured creditors and separate creditor matrices in their respective cases would generate a variety of lists with a large number of duplicate entries. Consolidating the list of creditors to one list between the Debtors of the 30 largest unsecured creditors is in the best interest of the Debtors, their estates, and their creditors to avoid unnecessary duplication and to ensure administrative inefficiency.

### iii.     Claims Agent Retention Application

47.     Epiq Corporate Restructuring, LLC's ("Epiq") retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases. I am informed that Epiq has acted as the claims and noticing agent in numerous cases of comparable size.

48.     Epiq's retention to act as an agent of the Court, as an independent third party with significant experience in this role, is in the best interests of the Debtors as well as their estates and creditors.

### B.     Operational First Day Pleadings

### i.     Cash Collateral/DIP

49.     The Debtors seek relief under the DIP Motion to utilize their cash and to obtain additional financing to prosecute the Chapter 11 Cases and run a sales process. The Debtors need the immediate use of cash collateral and additional financing to fund operations for the sales process. Otherwise, the Debtors will experience irreparable harm because they cannot their pay professionals or employees without the use of cash collateral and additional financing as the timing and recovery of their accounts receivable is very uncertain. Through the use of cash collateral, the Debtors will have access to the necessary funding to (a) continue the day-to-day operations of their

businesses, (b) maintain the value of their assets, (c) formulate, negotiate, and implement a value-maximizing sale transaction, and (d) fund these Chapter 11 Cases.

  **ii. Cash Management Motion**

  50. Since July 19, 2019, the Debtors' cash has been swept by their prepetition lender, White Oak Global Advisors, LLC ("White Oak"), after the Debtors defaulted on their prepetition secured facility. Prior to White Oak sweeping the Debtors' cash, the Debtors maintained a cash management system to facilitate cash flow between Debtor entities, while minimizing costs. The Debtors seek to simplify that system on a postpetition basis to ensure that the Debtors are able to fund operations during the proposed sales process.

  51. The proposed cash management system (the "Cash Management System") includes four bank accounts (collectively, the "Bank Accounts") controlled by Epic at two banks (collectively, the "Banks"). A list of the Debtors' current Bank Accounts (the "Account List") is attached to the Cash Management Motion as **Exhibit A**.[6] All of the Debtors' bank accounts are included in the U.S. Trustee's List of Approved Depositories.

  52. Contemporaneously with the filing of this Motion, the Debtors have filed a motion to obtain postpetition financing from White Oak. The proposed financing will be provided to the Debtors' Bank Account at Capital One Bank, N.A. and then payments will be disbursed from this account to two Bank Accounts at Bank of America, N.A. where payments will be made pursuant to the postpetition financing budget (the "DIP Budget"). The Bank of America account ending 8563 will be used for vendor ACH and wires, and the Bank of America account ending 1571 will

---

[6] The Debtors believe that Exhibit A is a complete list of their Bank Accounts. To the extent that any Bank Account has been omitted from that list, the Debtors request that the interim and final orders granting the relief sought herein apply to all Bank Accounts actually in, or linked to, the Cash Management System.

be used for payroll and benefits. Any customer receipts will be held by a third Bank Account at Bank of America.

**Business Forms and Investment and Deposit Practices**

53.     In the ordinary course of business, the Debtors may use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "<u>Business Forms</u>"). Given that the Debtors used the Business Forms prepetition, they do not include references to the Debtors' current status as debtors in possession. Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement of the Chapter 11 Cases that will soon be provided to parties in interest. Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

54.     I believe that requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

**Intercompany Transactions**

55.     In the ordinary course of business, Epic makes payments on behalf of the other Debtors (the "<u>Intercompany Transactions</u>"). The Debtors seek authority to continue the Intercompany Transactions postpetition.

56.     I believe that the failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily hinder operations. Absent the continuation of the Intercompany Transactions, the Debtors' ability to operate their business during the Chapter 11 Cases would be prejudiced, and their ability to maximize value for creditors would be reduced.

8398799v9

Avoiding such hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates. The Debtors therefore request that the Court authorize them to continue the Intercompany Transactions in the ordinary course of business.

        **iii.**    **Employee Wages Motion**

57.     As described more fully in the Employee Wages Motion, the continuation of the compensation (both in the form of salary and wages and benefit programs) for the Debtors' employees (each, an "Employee"), is critical to the Debtors' continued operations and reorganization.

58.     The Debtors' employees (collectively, the "Workforce") perform a wide variety of functions critical to the Debtors' operations, the administration of the Chapter 11 Cases, and the Debtors' successful reorganization.

59.     The Workforce is the most important part of the Debtors' business. I believe that any delay in paying or failure to pay prepetition Workforce Obligations could irreparably impair the morale of the Workforce at the time when their dedication, confidence, retention, and cooperation are crucial. Failure to pay the Employee Obligations could also inflict a significant financial hardship on the Employees' families. The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship. Without this relief, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise. Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful sale of their assets, which would benefit all parties in interest.

60.     As of the Petition Date, there are ten Employees working in the Corporate Office located at 1080 Eldridge Pkwy, Suite 1300, Houston, Texas 77077, two Employees working in

Belle Chasse, Louisiana, three Employees working out of Houma, LA, and 13 Employees working on the Hedron vessel in Louisiana.

**Wages and Salary**

61.     In the ordinary course of business, the Debtors pay their Employees every other Friday. Thus, the Debtors estimate that as of the Petition Date, approximately $234,789.00 is owed on account of accrued and unpaid wages and salaries for the Employees. In addition, the Unpaid Compensation as of the Petition Date also includes an estimated $14,750.00 owed to the Independent Contractors, which will become due within 30 days of the Petition Date.

**Other Compensation and Expenses**

62.     Unused Sick Leave is not paid out to an Employee regardless of the reason for termination. The Debtors do not believe that they owe any Vacation payouts to any former Employees as of the Petition Date.

**Reimbursable Expenses**

63.     The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, such as travel, food, and cell phones (the "Reimbursable Expenses"). There is a lag time between the time expenses are incurred and the time an expense is processed and reimbursed. Consequently, it is difficult for the Debtors to determine with precision the actual amount of incurred, but not reported, reimbursable expenses as of any particular time. Typically, however, the average aggregate monthly amount expended by the Debtors for the Reimbursable Expenses is between $2,700 and $4,050.

**The Health Plans**

64.     Postpetition the Debtors are seeking authority to replace the current healthcare plans, which include medical, dental, and vision benefits (the "Health Plans"), because the current

21

Health Plans are too expensive as the Debtors entered into the policies when they employed more employees.

**The Other Employee Benefits**

65.     Prepetition the Debtors maintained other Benefits for Employees, including Life Insurance, AD&D Coverage, Disability Benefits, and FMLA Leave Management (each as defined below, and collectively, the "Other Employee Benefits").[7]

66.     Postpetition the Debtors are seeking to provide their Employees life insurance, accidental death and dismemberment coverage, and disability benefits (the "Life Insurance," "AD&D Coverage," "Disability Benefits," respectively) through new coverage because the previous coverage is too expensive as it was put in place when the Debtors had more employees. The Debtors have grossed up wages by 25% in the DIP budget to account for the new coverage, and seek through this motion authority to enter into new policies for Life Insurance, AD&D Coverage, and Disability Benefits.

**Employee Withholdings**

67.     In connection with paying the Unpaid Compensation and the Benefit Obligations, the Debtors routinely deduct and/or withhold from the Employees' paychecks amounts that the Debtors are required to transmit to third parties. For example, the Debtors may deduct from the Employees' earnings, among other things, (a) payroll taxes related to federal, state, and local income taxes, FICA, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority; (b) employee contributions for health benefits and health care and dependent care spending accounts; (c) employee contributions to employee life insurance, long-term disability insurance, and personal accident insurance; and (d) legally ordered deductions, such

---

[7]     The Debtors do not hold any Employee funds that are not property of the estate.

8398799v9

as child support and garnishments (collectively, the "Employee Withholdings"). The Debtors then forward amounts equal to the Employee Withholdings from general operating accounts to appropriate third-party recipients.

68.     Generally, these funds are deducted from an Employee's earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients. Such withheld funds, to the extent they remain in the Debtors' possession, may constitute moneys held in trust and therefore may not be property of the Debtors' estates. As of the Petition Date, the Debtors estimate that they owe approximately $60,872.00 on account of Employee Withholdings.

69.     The Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee in excess of the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code on an interim basis. I also believe that the total amount sought to be paid by the Employee Wages Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations. Accordingly, I believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

     **iv.**    **Insurance Motion**

70.     In the ordinary course of their operations, the Debtors maintain workers' compensation insurance, business property insurance, general liability insurance, and other insurance programs (each, an "Insurance Program") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to taxes, other fees, and deductibles (collectively, the "Insurance Obligations"), in accordance with or relating to their respective

23

insurance policies (each, an "Insurance Policy") through several insurance carriers (each, an "Insurance Carrier").

71.     The Insurance Programs include: D&O insurance, general liability insurance, Marine Hull insurance, contractor's equipment offshore insurance, workers' compensation, mortgagees interest insurance, vessel pollution insurance, vehicle insurance, non-owned aviation and aircraft liability insurance, business property insurance, and professional liability insurance. A detailed list of the Insurance Policies is attached as to the Insurance Motion as **Exhibit A**. The Debtors also retain the services of various insurance brokers in connection with maintaining the Insurance Programs. The Insurance Programs and the role of each insurance broker are discussed below.

72.     The Debtors previously financed certain insurance policies under a Premium Financing Agreement, but cancelled the Premium Financing Agreement prepetition in order to save money through single policies. Accordingly, in order to maintain those policies previously subject to the now-cancelled Premium Financing Agreement, the Debtors have outstanding obligations as of the Petition Date.

**Workers' Compensation**

73.     In the ordinary course of business, the Debtors maintain Workers' Compensation Insurance for claims arising from or related to employment by the Debtors (the "Workers' Compensation Claims"). The Insurance Carrier for the Workers' Compensation Insurance is Manufacturers Alliance Insurance Company. In many instances, applicable law in the jurisdictions in which the Debtors operate requires that the Debtors maintain Workers' Compensation Insurance. The Workers' Compensation Insurance covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment with the Debtors.

24

74.     The Debtors renewed the Workers' Compensation Insurance for an annual premium based on projected employee-payroll, of approximately $25,071 on or around March 1, 2019, and it will expire on March 1, 2020. The Debtors paid this premium in full prepetition.

75.     Due to the nature of their business, some of the Debtors' employees may be exposed to certain occupational hazards. The Workers' Compensation Insurance requires no deductible, and thus the Debtors owe no amounts for Workers' Compensation Claims. All amounts owed for Workers' Compensation Claims are paid by Manufacturers Alliance Insurance Company. Accordingly, to the best of their knowledge, the Debtors do not owe any prepetition amounts on account of the Workers' Compensation Insurance.

76.     Under applicable workers' compensation laws, the Debtors or the applicable Insurance Carrier may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her other medical providers, or his or her heirs or legal representatives. Although unlikely, it is possible that an event giving rise to an obligation of the Insurance Carriers to make such a payment—for example, for injury or disease of an employee—could have occurred prepetition without the Debtors' knowledge.

**General Liability Program**

77.     The General Liability Program provides coverage for legal or contractual liability or other damages to third parties arising from or incurred to third parties in connection with the Debtors' operations or the Debtors' premises. This Insurance Program accordingly covers damages from the following:

- Maritime employer's liability, including indemnity and expenses of investigation and defense in connection with accidents or illnesses hereunder. This liability is covered up to $1,000,000, and the Debtors must pay a deductible of $25,000 for each accident or illness occurrence.

25

- General Commercial liability, including injuries to third parties arising out of the Debtors' operations. This liability is generally covered up to $1,000,000 per occurrence and the Debtors must pay a deductible of $25,000 for each occurrence.

- Protection and indemnity; up to $1,000,000 for any one accident or occurrence or series of accidents or occurrences arising from the same event. The Debtors must pay a deductible of $25,000 for each occurrence.

- Charterer's liability (excluding crew and cargo); up to $1,000,000 for any one loss or series of losses. The Debtors must pay a deductible of $25,000 for each accident or occurrence.

- Ship repairer's liability; up to $1,000,000 for any one loss or series of losses. The Debtors must pay a deductible of $25,000 for each accident or occurrence.

78.     The General Liability Program provides coverage up to an aggregate amount of $2,000,000, including defense and investigation costs.

79.     The Insurance Carrier is Lloyd's of London (through a syndicate of underwriters). The annual premium is $550,000, which the Debtors pay in three payments on May 1, August 1, and November 1. The coverage period is March 1, 2019, through March 1, 2020. The Debtors believe that, as of the Petition Date, approximately $92,500 is owed for the August 1, 2019 payment

**Umbrella Program**

80.     The Umbrella insurance provides an additional $10,000,000 in coverage for any one accident or occurrence. The annual premium is $802,350, which the Debtors pay in three payments on May 1, August 1, and November 1. The coverage period is March 1, 2019, through March 1, 2020. The Debtors believe that, as of the Petition Date, approximately $200,587.50 is owed for the August 1, 2019 payment.

**Marine Hull Program**

81.     The Marine Hull insurance covers a range of areas, including coverage and excess coverage for hull & materials, machinery outfit and rig equipment, as well as protection and

indemnity. Under protection and indemnity, there is a $50,000 deductible per accident or occurrence and under excess hull & machinery, machinery outfit & rig equipment, there is a $10,000,000 deductible per accident or occurrence. The annual premium is $1,336,543, which the Debtors pay in three separate payments on May 1, August 1, and November 1. The coverage period is March 1, 2019, through March 1, 2020. As of the Petition Date, the Debtors owe $298,500.75 for the August 1, 2019 payment.

**Contractors Equipment Offshore**

82.      The Contractors Equipment Offshore provides coverage of up to $25,000,000 for any one location and $10,000,000 in the annual aggregate for flood, named windstorm, earthquake and all losses resulting therefrom, each peril separately. The insurance carriers are Thomas Miller Specialty (AIG) for 25%, Thomas Miller Specialty (HDI) for 25%, and Norwegian Hull Club for 50%. There is a $20,000 deductible for each and every loss under storage and transportation and a $50,000 deductible for each and every loss under operational and subsea. The coverage period is March 1, 2019, through March 1, 2020. The annual premium is $483,914. The Debtors have removed this policy from the Premium Financing Agreement, but do not anticipate that any amounts are owed thereunder.

**Mortgagees' Interest and Mortgagees' Additional Perils Program**

83.      The mortgagees' interest and mortgagees' additional insurance covers White Oak Global Advisors, LLC, the administrative agent under the Debtors' Prior Senior Loan Agreement, up to the sum insured. The policy period is October 12, 2018, through October 12, 2019, and the premium is $11,250. The Debtors have paid this policy in full such that no outstanding amounts are owed as of the Petition Date.

8398799v9

**Vessel Pollution Program**

84.     The Vessel Pollution Program provides coverage for vessel pollution liability arising under various federal regulations. The coverage provides up to $5,000,000 per occurrence and the premium is $29,382. The insurance carrier under the Vessel Pollution Program is the Water Quality Insurance Syndicate. The coverage period is March 1, 2019, through March 1, 2020. The Debtors have removed this policy from the Premium Financing Agreement and estimate that they owe approximately $15,000 as of the Petition Date in order to keep the policy in place.

**Automobile Liability Program**

85.     The automobile liability provides coverage up to $1,000,000 for combined single limit liability; up to $1,000,000 for uninsured motorist coverage; up to $5,000 for medical payments; and the actual cash value of the automobile or the cost of repair, whichever is less. The deductible is $1,000 for physical damage comprehensive and $1,000 for physical damage collision. The coverage period is March 1, 2019, through March 1, 2020. The Debtors have removed this policy from the Premium Financing Agreement and estimate that they owe approximately $25,000 as of the Petition Date in order to keep the policy in place.

**Non-Owned Aircraft Liability Program**

86.     The Non-Owned Aircraft Liability Program covers liabilities to third parties resulting from bodily injury or property damage from the Debtors' use of non-Debtor owned aircraft. This program generally covers liability (i) for property or personal injury damages up to $5,000,000 for any one accident; (ii) up to $5,000,000 war liability on any one aircraft for each occurrence and in the annual aggregate; (iii) up to $5,000,000 for personal injury in each occurrence and in the annual aggregate; (iv) up to $5,000,000 for premises liability and combined single limit bodily injury and property damage in each occurrence; (v) up to $1,000,000 for physical damage liability for each occurrence; and (vi) up to $25,000 for medical expenses for

28

each person, including crew, subject to a maximum of $1,500,000 for each occurrence. The deductible is $2,500 for each loss for physical damage. The coverage period is March 1, 2019, through March 1, 2020, and the premium is $7,000. The Debtors have removed this policy from the Premium Financing Agreement and estimate that they owe approximately $4,000 as of the Petition Date in order to keep the policy in place.

**Business Property Liability Program**

87.     The Business Property Liability Program provides coverage protection against all risks of physical loss or damage to scheduled office contents and equipment. This coverage provides (i) property coverage, which includes a catastrophe limit of up to $6,378,433; coverage for the building up to $3,198,433; coverage for the business personal property up to $1,655,000; coverage for the dock up to $500,000; and coverage for the contractors equipment up to $505,000; (ii) flood coverage up to $1,000,000; and (iii) earthquake coverage up to $1,000,000. The insurance carrier is Markel American Insurance Company and the coverage period is March 21, 2019 through March 1, 2020. The Debtors have removed this policy from the Premium Financing Agreement and estimate that they owe approximately $20,000 as of the Petition Date in order to keep the policy in place.

**Management Liability Program**

88.     The Management Liability Program provides preventative protection against a variety of liability and damages associated with the Debtors' directors, officers, and other upper management; specifically the following areas, each within the first layer of coverage:

- Directors and Officers Liability: This provides coverage for the liability arising from the Debtors' directors and officers for alleged wrongful acts. Liability is covered up to $5,000,000 in aggregate for the coverage period, with a $25,000 for each occurrence. The coverage period is July 14, 2019, through July 14, 2020.

- Employment Practices Liability: This provides coverage against claims made by employees alleging discrimination, wrongful termination, harassment, and other

8398799v9

employment-related issues against the Debtors. Liability is covered up to $1,000,000 in the aggregate for the coverage period, with a $35,000 deductible for each occurrence. The coverage period is July 14, 2019, through July 14, 2020.

- <u>Fiduciary Duty Liability</u>: This provides coverage for claims of mismanagement of the Debtors' employee benefit plans. Liability is covered up to $1,000,000 in the aggregate for the coverage period. There is no deductible. The coverage period is July 14, 2019, through July 14, 2020.

89.     <u>Commercial Crime Insurance</u>: This provides coverage for liability accruing to the Debtors from an employee's alleged dishonesty, forgery or alteration, and computer fraud. Liability is covered up to $1,000,000 in the aggregate for the coverage period, with a $35,000 deductible for each occurrence. The coverage period is July 14, 2019, through July 14, 2020.

**Insurance Broker Services**

90.     The Debtors retain McGriff, Seibels & Williams, Inc. to serve as their insurance brokers and consultants for the Insurance Programs (each in such capacity, an "<u>Insurance Broker</u>"). The Insurance Brokers provide access to specific markets and expertise in certain lines and types of coverage. In addition, the Insurance Brokers often act as the intermediary between the Debtors and the Insurance Carriers, as the Insurance Brokers will often transfer insurance premiums and claims asserted for various Insurance Programs to the various Insurance Carriers. The Debtors pay the Insurance Brokers commissions up-front as policies are renewed each year, based on the aggregate amount of the insurance premiums. As of the Petition Date, the Debtors have an outstanding amount owed of $112,500, due September 1, 2019. The Debtors request authority from this Court to pay this outstanding amount by September 1, 2019, and to keep making payments to the Insurance Brokers for the Insurance Obligations, as necessary under the Insurance Programs.

91.     In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it is essential that the Debtors maintain the Insurance Programs and that they obtain authority to pay all obligations related thereto,

8398799v9

including outstanding payments to the Insurance Broker. Without authority to maintain and pay amounts owed in connection with the Insurance Programs, the ability of the Debtors to conduct business operations would come to a halt to the detriment and prejudice of all parties in interest. Additionally, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors would be able to renew or replace their existing Insurance Programs on more favorable terms. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs to comply with the U.S. Trustee's operating guidelines, applicable state and federal laws, requirements from state and federal regulatory agencies, and other prepetition contracts. Based on the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### v.   Taxes Motion

92.     I understand that the taxes the Debtors typically incur generally fall into the following categories: Payroll Taxes, Income Taxes, Property Taxes/Ad Valorem Taxes, Franchise Taxes, and Regulatory Assessments (each as defined in the Taxes Motion and collectively, the "Taxes"). A non-exclusive list of the Taxing Authorities is set forth on **Exhibit A** to the Taxes Motion.

### 1.   Payroll Taxes

93.     As set forth in more detail in the Debtors' Employee Wages motion,[8] in the normal course of business, payroll related to trust fund taxes accrue as employees provide services to the Debtors. Where applicable, these payroll related taxes include federal, state, and local income tax, social security tax, Medicare, state unemployment insurance, and state disability insurance

---

[8]  *See Debtors' Emergency Motion for Final Order (i) Authorizing, But Not Directing, the Debtors to Pay Prepetition Workforce Obligations; (ii) Authorizing, But Not Directing, the Debtors to Continue Certain Workforce Benefit Programs; and (iii) Authorizing, But Not Directing, Applicable Banks and Financial Institutions to Honor Prepetition Checks for Payment of the Prepetition Workforce Obligations*, filed contemporaneously with this Motion.

8398799v9

(collectively, the "Payroll Taxes").[9] Generally, these funds are deducted from employee earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients. Such withheld funds, to the extent they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' estates. Out of an abundance of caution, however, by this Motion, the Debtors seek authority, in their discretion, to forward the Payroll Taxes to the appropriate parties in the ordinary course.

### 2. Property Taxes/Ad Valorem Taxes

94.     The Debtors own, or owned, property in Louisiana, and certain Taxing Authorities in Louisiana have the authority to levy property occupancy taxes, real estate taxes, and other property taxes against the Debtors' real and personal property (the "Property Taxes"). As of the Petition Date, the Debtors not believe any amounts are outstanding on account of the Property Taxes; however, certain Property Taxes attributable to the prepetition period may come due during the Chapter 11 Cases. Thus, the Debtors request authority to pay all prepetition Property Taxes that have accrued as of the Petition Date and to continue to pay such obligations in the ordinary course on a postpetition basis.

### 3. Franchise Taxes

95.     The Debtors are required to pay taxes assessed for the privilege of doing business within a particular jurisdiction (the "Franchise Taxes"). The Debtors pay Franchise Taxes to the applicable Taxing Authorities in Texas and Louisiana. Franchise Taxes are typically paid quarterly or annually to the applicable Taxing Authorities. As of the Petition Date, the Debtors do not believe they owe any prepetition Franchise Taxes. The Debtors request authority to honor any prepetition

---

[9]     Given the payroll cycle and the Petition Date, the Debtors believe that they owe approximately $17,392.00.

8398799v9

Franchise Taxes, to the extent any exist, and to pay any postpetition Franchise Taxes in the ordinary course of business.

### 4. Regulatory Assessments

96.      In the ordinary course of business, the Debtors incur certain regulatory assessments and fees, including Patent and Trademark office fees (collectively, "Regulatory Assessments," and together with Payroll Taxes, Franchise Taxes, and Property Taxes, the "Taxes"). The continued payment of Regulatory Assessments, including any amount due and owing on account of Regulatory Assessments incurred prior to the Petition Date, are crucial to the continued operation of the Debtors' business. Further, payment of Regulatory Assessments is required under state and federal law and non-compliance would be a violation of state and federal statutes. The Debtors do not believe that any Regulatory Assessments remain unpaid as of the Petition Date.

97.      I understand that, as of the Petition Date, the Debtors are current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period are not yet due. Further, I understand that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby creating a greater recovery for stakeholders. If the Taxes are not timely paid, the Debtors would be required to expend disproportionate attorneys' fees and other costs to resolve various issues related to such obligations in light of the relatively *de minimis* amount of the Taxes. The Debtors believe some of the Taxes constitute trust fund obligations that are not property of the Debtors' estates, and as to which the Debtors' officers and directors may have personal liability in the event of nonpayment. Efforts by the Taxing Authorities to collect such trust fund amounts would provide obvious distractions to the Debtors and their officers and directors in their efforts to maximize the value of the Debtors' estates.

8398799v9

98.     And, even with respect to the Taxes that are not trust fund taxes, the Debtors believe that paying such Taxes will ultimately benefit the Debtors' estates and their stakeholders. I believe that many of those Taxes may be entitled to priority under the Bankruptcy Code or may be subject to liens. Therefore, other creditors, stakeholders, and other parties in interest will not be prejudiced if such prepetition taxes are paid

### vi.     Utilities Motion

99.     As more fully described in the motion, the Debtors will incur expenses for water, electricity, telecommunications, and internet (collectively, the "Utility Services") provided by four utility providers (collectively, the "Utility Companies") at the properties located in Belle Chasse, Louisiana and in Houston, Texas, a list of which is attached as **Exhibit A** to the Utilities Motion (the "Utility Company List"). Although the Debtors currently incur expenses for other utilities, the Debtors are not seeking to continue those services postpetition. On average, the Debtors spend approximately $9,118.96 each month on utility costs to the Utility Companies.

100.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Chapter 11 Cases. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of these cases. Indeed, any interruption of utility services, even for a brief period, would seriously jeopardizing the Debtors' proposed sales and, ultimately, recoveries to creditors. It is therefore critical that utility services continue uninterrupted during the Chapter 11 Cases.

101.     I believe and am advised that the Adequate Assurance Procedures (as defined in the Utilities Motion) are necessary to the success of the Debtors' Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Companies for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases. Discontinuation of Utility Service could disrupt operations and jeopardize the

8398799v9

Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and stakeholders' recoveries.

102.    Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' businesses at this critical juncture as the Debtors transition into chapter 11. Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional adequate assurance. Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

## C.    Request for Emergency Consideration

103.    The Debtors request emergency consideration of the Joint Administration Motion; the Creditor List Motion; the Cash Collateral/DIP Motion; the Cash Management Motion; the Insurance Motion; the Taxes Motion; the Employee Wages Motion; the Utilities Motion; and the Claims Agent Retention Application. I believe that, based on the complexity of the Chapter 11 Cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

### Conclusion

104.    The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, the terms of the Debtors' balance sheet restructuring, and the critical need for the Debtors to restructure their financial affairs and operations. The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

8398799v9

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.

Dated: _____, 2019.
       Houston, Texas

By: _____
Name: Kelton C. Tonn

36